Carmelia VELEZ, Hector Velez, Victoria Arnita Green, Cynthia Chappell, Catherine Nixon, and Clarence Pitts, on behalf of themselves, and on behalf of all other persons similarly situated,

v.

Henry CISNEROS, in his official capacity as Secretary of the United States Department of Housing and Urban Development, the United States Department of Housing and Urban Development, Jacquelyn M. Pryor, in her official capacity as Executive Director of the Chester Housing Authority, and Chester Housing Authority.

Civ. A. No. 90–6449.

United States District Court, E.D. Pennsylvania.

April 29, 1994.

Lawrence J. Fox, David M. Doto, Drinker, Biddle & Reath, Philadelphia, PA, Denise M. Heberle, Jane Molt, Delaware County Legal Assistance Ass'n, Roger V. Ashodian, Chester, PA, Brian S. Mudge, Nadia Myrytiuk Jannetta, Drinker, Biddle & Reath, Philadelphia, PA, for plaintiffs.

Arthur R. Goldberg, Judry L. Subar, Raphael O. Gomez, Elaine Romberg, Felix Baxter, Dept. of Justice, Civ. Div., Washington, DC, Debra Leanne Wrobel Cohn, U.S. Attys. Office, Philadelphia, PA, Andrew C. Phelan, U.S. Dept. of Justice, Civ. Div., Washington, DC, Ronald David Ashby, Ronald David Ashby & Associates, P.C., Media, PA, Francis X. Crowley, Blank, Rome, Comisky & McCauley, Philadelphia, PA, Ronald H. Surkin, Media, PA, for defendants.

### MEMORANDUM and ORDER

SHAPIRO, District Judge.

## I. PROCEDURAL HISTORY

Plaintiffs filed this action on behalf of the class of past, present, and future tenants of Chester Housing Authority public housing against the United States Department of Housing and Urban Development, its secretary Jack L. Kemp, Chester Housing Authority, and its Executive Director Earline Mann. Defendants Henry Cisneros and Jacquelyn M. Pryor were substituted for defendants Kemp and Mann, respectively, pursuant to Fed.R.Civ.P. 25(d).[1] The Second Amended Complaint ("Complaint") requested declaratory and injunctive relief for alleged violations of federal housing law, the Administrative Procedures Act ("APA"), civil rights laws, and breach of the Annual Contributions Contract ("ACC") between HUD and CHA. With the consent of the parties, the court appointed the Honorable William M. Marutani as mediator to promote discussion between the parties, assist them to develop and exchange pertinent information concerning the issues, and arrive at a mutually acceptable resolution of the controversy. While media-

---

1. United States Department of Housing and Urban Development and its secretary Henry Cisneros will be collectively referred to as "HUD"; Chester Housing Authority and its Executive Director Jacquelyn M. Pryor will be collectively referred to as "CHA."

tion was underway, HUD declared CHA a "Troubled Housing Authority" in substantial breach of its obligations under the ACC and assumed control of the assets and management of CHA.

Mediation was unsuccessful. On October 25, 1991, plaintiffs filed a motion for a preliminary injunction alleging that dangerous conditions threatened the lives, health, and safety of the tenants. While this motion was pending, HUD took control of CHA and contracted with the Quadel Consulting Corporation ("Quadel"), a professional management firm, to manage CHA and remedy the problems causing the "Troubled Housing Authority" designation. The future operation of CHA was uncertain, so the parties agreed to continue the preliminary injunction hearing several times. At a hearing held on January 9, 1992, plaintiffs withdrew the motion for preliminary injunction to give new management a chance to improve the conditions of which plaintiffs complained. The court placed the case in administrative suspense to enable the parties to complete fact finding and discuss settlement further in light of the new developments.

The defendants conducted a Needs Assessment, prepared a Comprehensive Grant Plan according to the requirements of HUD's Comprehensive Grant Program regulations, 42 U.S.C. § 1437(a)-(o), 24 C.F.R. § 968, and initiated a plan of reconstruction and restoration. Plaintiffs remained dissatisfied and opposed defendants' plan to hire an executive director without "adequate input" from the tenants and the City of Chester. On July 31, 1992, plaintiffs filed a motion to restore the case to active status and preliminarily enjoin the appointment of an executive director.

The court held hearings on plaintiffs' motion for a preliminary injunction for nine days, beginning September 25, 1992. Many tenants testified on behalf of the plaintiffs and aired general grievances against CHA management and housing conditions. The selection of a new executive director—the ostensible reason for the hearing—was scarcely mentioned. The court granted the motion to return the case to active status but declined to enjoin the appointment of an executive director for lack of a showing of

irreparable harm. The court set a February 17, 1993 trial date.

Plaintiffs, requesting several extensions of time for discovery, represented that personnel changes at Delaware County Legal Assistance and in the executive branch of the federal government made preparation for trial overly burdensome and possibly unnecessary. Plaintiffs also stated that additional time would enable newly retained counsel to assume significant responsibilities. The court, by order of January 7, 1993, modified the trial schedule to accommodate the plaintiffs. The trial, continued until May 3, 1993, was allowed to proceed on behalf of a plaintiff class consisting of "all current tenants of public housing owned and operated by CHA or HUD." Memorandum and Order of February 17, 1993. A non-jury trial was held on twelve days during the period from May 3, 1993 to July 9, 1993.

## II. SUMMARY OF THE COMPLAINT

The plaintiff class claims that defendants have caused constructive demolition ("de facto demolition") of CHA housing by failure to fill vacant units, maintain occupied units in a habitable condition, train maintenance workers, perform routine inspections, and respond promptly to tenant complaints.

Count I of the complaint alleges that CHA took action to demolish a portion of the William Penn Homes without HUD approval and without meeting the statutory criteria required by 42 U.S.C. § 1437p. Although HUD initially approved CHA's demolition plan, CHA withdrew its proposed demolition plan shortly after obtaining funds for comprehensive modernization of the project in September, 1992. This Count will be dismissed as moot.

Counts II and III allege that CHA's gross neglect and mismanagement constitute constructive (de facto) demolition of public housing units in violation of 42 U.S.C. § 1437p. Count IV alleges that HUD violated 42 U.S.C. § 1437p by approving the plan to demolish a portion of William Penn Homes even though the plan failed to meet statutory and regulatory criteria. At trial, plaintiffs also argued that HUD had engaged in de

facto demolition of CHA housing units by failing to prevent de facto demolition of housing units prior to November 6, 1991 and by permitting it as manager of the projects subsequent to November 6, 1991.

Count V alleges that HUD's approval of the now-withdrawn plan to demolish a portion of William Penn Homes violated the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–06. Plaintiffs also argued at trial that HUD violated the APA by failing to prevent de facto demolition of units prior to November 6, 1991 and making arbitrary and capricious decisions as manager of CHA housing units subsequent to November 6, 1991.

Count VI alleges that defendants have violated the ACC and that plaintiffs are entitled to enforce its provisions against CHA as third party beneficiaries.

Count VII alleges that the defendants' failure to preserve public housing units and defendants' actual and de facto demolition of units have had a racially discriminatory impact in violation of § 3604 of the Fair Housing Act, 42 U.S.C. §§ 3601–3631 ("Housing Act"). Count VIII alleges that HUD violated the Housing Act by failing to protect plaintiffs from racially discriminatory treatment. Count IX alleges that the actions and omissions by defendants are a part of a pattern of intentional discrimination against non-whites in public housing in violation of Title VI of the Civil Rights Act, 42 U.S.C. § 2000d. Plaintiffs presented no evidence regarding Counts VII, VIII, and IX; these counts were dismissed for failure of proof at close of plaintiffs' case.

Count X alleges that CHA violated the Housing Act by including a lease requirement requiring tenants to pay for repairs necessary to restore housing units to habitable conditions. Count X also alleges that CHA violated the Housing Act by requiring tenants to pay for repairs caused by normal wear and tear or acts of third parties.

## III. FINDINGS OF FACT AND CONCLUSIONS OF LAW

The court makes the following findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52(a).

### A. Findings of Fact

1. Conditions Prior to November 6, 1991

a. Vacancies and Turnaround Time

CHA operates five public housing developments in the City of Chester, Pennsylvania: Ruth Bennett Homes ("Bennett"), Lamokin Village, William Penn Homes ("Penn"), McCaffery Village, and Chester Towers. These developments contain approximately 1,700 public housing units.

According to HUD performance indicators, a vacancy rate of 3% or above is "deficient." 24 C.F.R. § 901.05(k); 24 C.F.R. § 901.-10(b)(1)(vii); at that rate, more than 51 vacancies for CHA's 1,700 units would be "deficient" performance. However, HUD allows a Public Housing Authority ("PHA") to deduct units approved for demolition in calculating the vacancy rate, 24 C.F.R. § 901.-05(e)(1), and permits adjustment for funded on-schedule modernization. 24 C.F.R. § 901.10(b)(1)(vii)(B).

On December 30, 1987, there were 97 vacant units at the five CHA developments; as of December 30, 1988, this number had increased to 138. Pls.' Ex. 1; Administrative Record ("A.R.") at 20413. By December 30, 1990, there were 262 vacant units; 79 of these units were vacant pursuant to a HUD-approved plan to demolish portions of Penn. Id. On December 30, 1991, the number of vacancies rose to 320; 100 vacancies were in anticipation of the planned demolition at Penn. Pls.' Ex. 1.

According to HUD performance indicators, an annual average of vacancy days per turnaround of 30 or more calendar days is "deficient." 24 C.F.R. § 901.05(k); 24 C.F.R. § 901.10(b)(5). In 1986, the average time for CHA to prepare a vacant unit for occupancy was 62 days; by 1989–90, the average time to prepare a vacant unit for occupancy had risen to 315 days. A.R. at 20414.

b. Physical Conditions

On November 1, 1991, William Henderson, Chief of Assisted Housing Management Branch for HUD's Philadelphia regional of-

fice, visited Bennett, Lamokin Village, Penn, and McCaffery Village. A.R. at 4289. Henderson did not walk through the Penn project because of concern for his personal safety; however, half of the vacant units that he observed were "not secured and had broken, wide open windows on the second and third floors," and "trash was strewn throughout the site with no indications that it had been recently picked up." A.R. at 4289–90. His opinion was that Penn was "clearly moving towards being an uninhabitable site." A.R. at 4290.

At Bennett, Henderson found that every boarded vacant unit on the first floor had been entered, boarded windows and doors were unsecured, and windows on the second floor were broken and open to rain and vandalism. A.R. at 4289. "Trash was strewn throughout the site with no apparent recent attempts to pick it up in the areas with significant numbers of vacancies." *Id.* Drug dealers appeared to be on the project grounds, and "[t]here appeared to be a direct relationship between this suspected drug dealing and the serious dilapidation of units." *Id.* Henderson believed that Bennett was "rapidly sliding to the point that it will be as deteriorated as William Penn in six to twelve months." A.R. at 4290.

At McCaffery, about half of the approximately 38 vacant units had been entered and vandalized; the vandalized second floor units had broken windows. *Id.* "Junction boxes on the second floor of several units were uncovered exposing the wiring to rain," this created a fire hazard. *Id.* Henderson suspected that illegal drug activity was also taking place there. *Id.* While more stable than Bennett or Penn, McCaffery was "at the beginning stages of a serious decline if conditions [were] not quickly reversed." *Id.* At Lamokin, Henderson observed a drug sale before leaving the site out of concern for his personal safety. A.R. at 4289. Trash collection was a serious problem. *Id.*

On October 11, 1991, Michael Smerconish, a HUD regional administrator, summarized the state of the projects in a memorandum stating that:

> The Authority's housing stock is in disrepair; its projects are not being maintained;

the present management lacks the capability to obtain and manage the funds necessary to make needed physical improvements; it is unable to prepare vacant units in a timely fashion; its procurement is deficient resulting in the purchase of supplies and services at excessive prices and without assurance that they are of the highest quality....

A.R. at 20399–400. CHA had "not expressed even the intention to institute the remedial and curative actions to make CHA a viable independent public housing authority." A.R. at 20400. The "vast majority of units" had "basic health and safety" problems. A.R. at 20401. Most of the over 300 vacant units had been seriously vandalized and needed major repairs. A.R. at 20402.

An inspection of the sites on December 3, 1991, by Linda Williams, Underwriting Manager for Foxco Insurance Management Services, Inc., revealed the condition of the projects just after the HUD takeover. Squatters in the projects were "a constant problem"; vacant units had live electrical systems with torn switch boxes and outlet boxes leaving exposed live wires; one unit had a sink torn out and another had a valve left open so that water was dripping into the units below them; some steam radiators had not been shut off (the units were "so hot its [sic] like entering a steam bath" despite the absent or broken windows in those units); hardwood floors in vacant units had been damaged by rain water; numerous windows in occupied and unoccupied units were broken; and debris accumulation in some stairwells at Penn was so bad that "a person would need to have the surefootedness of a mountain goat to get up or down." A.R. at 30501–02. It was evident that CHA had either conducted no routine inspections of the units or was clearly failing to respond to readily observable problems. *Id.*

A Quadel draft report in February, 1992, based on an assessment conducted from December 2, 1991 to January 31, 1992, stated that although the condition of dwelling units varied from "poor to very good", CHA units suffered from "several chronic problems" such as "frequent sewer back-ups," "leaks from steam and water pipes causing weak-

ened and buckled floors, plaster damage, deterioration to cabinets, sweating walls (from steam condensate), peeling paint and electrical shortages," broken windows, missing screens, and inoperable locks. A.R. at 24345, 24399. Trash collection was a serious problem. "Trash and garbage lie everywhere. Wild dogs, birds and rodents abound on CHA properties, sustained by the bountiful garbage. The situation is totally out of control." A.R. at 24400.

### c. Maintenance

Maintenance of the units at the time of the HUD takeover was very poor. CHA maintenance staff was not capable of maintaining housing units in a decent, safe, and sanitary condition. A.R. at 20412. Quadel, in its draft report to HUD, found that ten of CHA's budgeted forty-three full-time line worker positions were not filled by active workers; staff had been hired in accordance with a "pervasive system of patronage," with "little attention ... to the skills or work habits of applicants for employment"; staff productivity was low, with some staff "complet[ing] as few as one work order per week"; the workforce was "generally under-qualified," although some workers had developed good skills on the job; the quality of work "reflect[ed] a wide variety of skill levels"; few maintenance records were kept; CHA did not manage resident work orders in an organized or centralized system; 2,000 work orders logged in 1991 were unaccounted for; the work order process made it "nearly impossible to track employee activity and to hold staff accountable for poor performance"; and although emergencies were usually abated, the quality of work was often poor. A.R. at 24345, 24393–400.

### d. Financial Conditions

In his October, 1991 memorandum, Smerconish described CHA's financial condition as in a "state of collapse." A.R. at 20418. From 1989 through 1991, actual expenditures

had exceeded the budget on controlled line items by $432,709; CHA lost $582,889 by failing to collect rents owed; and CHA lost $556,123 by failing to have vacant units reoccupied. A.R. at 20419–24. In addition, CHA had written off $461,944 in collection losses. A.R. at 20419. CHA's operating reserve had dropped from $1632,359 in 1989 to $290,304 in 1991; however, the reserve was only a paper figure, and Smerconish believed that CHA's bills actually exceeded its available funds. A.R. at 20419. Because of the "precipitous decline" in CHA's financial condition, Smerconish believed that CHA could not "continue to provide basic services for very long." A.R. at 20418.

### 2. The HUD Takeover

On November 5, 1991, HUD notified CHA that it had substantially breached and defaulted on the ACC and that HUD was exercising its right under sections 501 and 502 of the ACC to take immediate possession of CHA and its operations. A.R. at 19916–18.[2] On November 6, 1993, CHA voluntarily surrendered possession of the Authority's assets and property and agreed not to interfere with the operation of CHA by the HUD designee. A.R. at 19954–55. CHA's Board of Commissioners was left with only residual authority; reconstituting the Board was at HUD's sole discretion. A.R. at 19955. CHA's Board of Commissioners has not met since November 5, 1991. Henderson, Tr. 5/6/93 at 15. On November 7, 1993, HUD issued a memorandum delegating "all power and authority necessary to oversee and control the entire operation" of CHA to Henderson. A.R. at 19914. Although HUD took possession of CHA, HUD did not exercise its option to assume title to CHA. The memorandum delegating oversight and control of CHA to Henderson stated that "HUD has assumed *oversight* of the *normal operations* of [CHA]." *Id.* (emphasis supplied).

---

**2.** HUD exercised its rights under the ACC partly in response to this action. After describing the status of the court proceedings, Smerconish stated in his October, 1991 memorandum that: "In order to avoid a full court hearing and the possibility of the Court appointing a receiver, the Department needs to have a plan of action by the end of the month.... Failure to take any action would create a policy void which would permit Judge Shapiro to make decisions and policy for the Department." A.R. at 20399.

Henderson exercised all of the essential powers with regard to CHA that were formerly exercised by CHA's Board of Commissioners, including control of management, maintenance, finance, and expenditure or commitment of any funds. Henderson, Tr. 10/5/92 at 180. A memorandum from Henderson to all CHA employees stated, "[A]ll Documents but not limited to including [sic] letters, contracts purchase orders and checks are to be signed only by William Henderson." A.R. at 333. The memorandum also stated that Henderson's signature block on all letters should include the phrase "Acting on behalf of and in the name of the CHESTER HOUSING AUTHORITY." *Id.* However, Henderson did sign some documents on behalf of the Chester Housing Authority/Board of Commissioners shortly after the takeover. Henderson, Tr. 5/6/93 at 14–15.

On November 25, 1991, CHA, through Henderson, entered into a contract with Quadel; Quadel was to provide management, consulting, and technical assistance to CHA for at least six months beginning December 2, 1991, with an option to extend the contract for a one-year period. Pls.' Ex. 85; A.R. at 20664–89. The contract was extended for one year on June 2, 1992. Pls.' Ex. 85. CHA and Quadel entered into a contract for an additional year on June 2, 1993. Cayford, Tr. 6/14/93 at 124.

### 3. Conditions at Time of Trial

#### a. Vacancies

At the time of the HUD takeover in November, 1991, Henderson and Smerconish planned to move quickly to reduce the number of vacancies. Shortly after the HUD takeover, approximately 75 units were rehabilitated for immediate occupancy. Collins, Tr. 5/5/93 at 52. However, that initial plan was abandoned in order to do lead testing and concentrate funds on occupied units. Henderson, Tr. 5/6/93 at 64–65. The subsequent availability of large HUD grants for modernization and reconstruction resulted in a decision not to rehabilitate vacant units for immediate occupancy. *Id.* at 65. As a result of this decision, the number of vacancies continued to rise. There were 405 vacancies on December 30, 1992, Pls.' Ex. 1, and approximately 440 at the time of trial. Collins, Tr. 5/5/93 at 56. None of these vacancies were pursuant to the demolition plan for Penn, withdrawn shortly after CHA was awarded funds for Major Reconstruction of Obsolete Public Housing ("MROP") in September, 1992. Watts, Tr. 5/12/93 at 201–02; Rotondaro, Tr. 11/2/92 at 79–80.

CHA, managed by HUD ("CHA/HUD"), boarded and sealed units as they became vacant and did not prepare them for immediate occupancy. When a unit became vacant, a CHA/HUD crew secured any immediate hazards, removed trash and debris, and then boarded the unit to seal it without regard to the cost of rehabilitating the unit for immediate occupancy. *Id.* at 44, 47; Collins, Tr. 5/5/93 at 49. This policy applied to all the developments except Chester Towers. *Id.* at 51. Because of the proposed comprehensive modernization and reconstruction program, CHA/HUD believed it would be fiscally and managerially more efficient to allow units to remain vacant pending a large-scale modernization and reconstruction program than to perform interim repairs to rehabilitate vacant apartments for immediate occupancy. Henderson, Tr. 5/6/93 at 47; Collins, Tr. 5/5/93 at 49–50. Aside from units at Chester Towers, the only units recently rehabilitated or undergoing rehabilitation were eight four bedroom units for occupancy by families entitled to four bedroom units but in apartments too small for them. *Id.* at 48.

#### b. Maintenance

In the first week of December, 1991, Quadel appointed Paul Collins, a Quadel employee, to serve as CHA's maintenance superintendent. Collins, Tr. 5/5/93 at 6–7. At that time, there were ten maintenance staff positions vacant; Collins hired laborers and aides to fill those positions. *Id.* at 28. With one exception, the staff employees were not licensed plumbers or electricians, *id.* at 12–13; however, CHA's union contract was not based on licensed trades. *Id.* at 13, 26. Some of the staff employees may have had skills equivalent to those in licensed trades. *Id.* at 28. Collins called experts or contractors when faced with a problem beyond the

qualifications or abilities of his staff. *Id.* at 76–77.

Collins reorganized the maintenance staff into site-based crews, eliminated patronage considerations in hiring, and gave employees basic skills tests. Collins, Tr. 5/12/93 at 7, 9. Collins instituted formal methods of tracking worker productivity. *Id.* at 11–12. The maintenance department instituted a preventive maintenance plan and hoped to expend approximately 30% of its work on preventive maintenance by the end of 1993. *Id.* at 16. Collins made considerable personal efforts to have the maintenance department more responsive to tenant complaints and concerns by attending tenant meetings and speaking with individual tenants. *Id.* at 25, 26. Collins also instituted a centralized work order system. *Id.* at 25–27.

The maintenance department responded to over 90% of situations considered threatening to immediate health or safety within 24 hours, and responded to over 90% of urgent, but not life-threatening, complaints within five days. *Id.* at 28–30. Almost all other work orders were completed within thirty days of reporting. *Id.; see also* Def. CHA Ex. 50; Def. CHA Ex. 51. No list was kept of work orders recurring after a previous repair, Collins, Tr. 5/5/93 at 47–48; however, Collins believed that the number of work orders of this kind were very small. *Id.* at 48.

Although work orders were completed, Collins did not evaluate his staff's maintenance work by recognized written standards. Collins, Tr. 5/5/93 at 14–15. Instead, he evaluated the quality of work through site visits and personal standards developed through fifteen years of experience in supervision of maintenance employees. *Id.* Collins also relied on tenant reports of satisfaction with repair work and on reports by City of Chester building code inspectors. *Id.* at 15; Collins, Tr. 5/12/93 at 40. Collins did not determine whether the repair work met code requirements. Collins, Tr. 5/5/93 at 17.

Dr. Thomas Nutt–Powell, CHA's expert witness, testified that the quality of maintenance work was acceptable, Nutt–Powell, Tr. 5/11/93 at 75–76; plaintiff's expert witness, William Smith, testified that maintenance

and rehabilitation work was of poor quality. Smith, Tr. 5/3/93 at 138–40. Both experts based their opinions on questionable small random samples of occupied units. *See* Nutt–Powell, Tr. 5/11/93 at 97–98 (opinion based on inspection of no more than three or four units at each development in January, 1993); Smith, Tr. 5/3/93 at 155–171 (opinion based on random sample of 31 occupied units without regard to distribution by unit size or floor).

Defendants' expert witness, William Ewall, director of construction at the Cambridge Housing Authority, had extensive experience in maintenance and large-scale modernization consulting and was the most credible expert. Ewall, Tr. 5/11/93 at 143–45. Ewall stated that it generally takes five years to "turn around" a maintenance department that is unionized or hired from civil service rolls. *Id.* at 154. He believed that the maintenance department had made "impressive strides in the 18 months they've been in place." *Id.* at 176. It is difficult to maintain efficiently systems as old as those at CHA. *Id.* at 175. Vandalism continues to be a severe maintenance problem at CHA. Collins, Tr. 5/5/93 at 82–83.

### c. Certificates of Occupancy and Housing Quality Standards Inspections

A Certificate of Occupancy is required by the City of Chester whenever an individual moves into a vacant apartment. *Id.* at 20. When Collins first arrived at CHA, approximately 600 units had a Certificate of Occupancy. *Id.* at 77. By the time of trial, between 1,120 to 1,150 units had a Certificate of Occupancy. Approximately 140 occupied units did not have a Certificate of Occupancy. *Id.* at 18–20.

CHA units are required to comply with federal Housing Quality Standards ("HQS"). Henderson, Tr. 5/6/93 at 92. In an HQS inspection, each unit is examined against a HQS checklist, but the federal standards are not as high as those required for the issuance of a Chester Certificate of Occupancy. *Id.* at 93. CHA/HUD had not even conducted HQS inspections since the HUD takeover, but

planned to conduct HQS inspections by the end of this fiscal year. *Id.* at 93–94.

#### d. Fire Safety

Although Mr. Smith's sampling method was questionable, his investigation demonstrated that at least some aspects of CHA's fire prevention and warning systems were not adequate. Smith found some hard-wired alarm systems were inappropriately wired through circuit breakers; other detectors were broken or missing. Smith, Tr. 5/3/93 at 93–96, 98. However, there was no evidence that inappropriately wired systems were not functioning properly.

The majority of battery-operated detectors inspected by Smith did not operate; some of these detectors had roaches inside. Some residents may have removed the batteries to prevent false alarms because of this situation. *Id.* at 96. Smith estimated that approximately 80–85% of the units in the small sample of units he investigated had missing or inoperative smoke detectors. Smith, Tr. 5/4/93 at 42. The apartments in Chester Towers had heat detectors instead of smoke detectors, and fire extinguishers at Chester Towers were in cabinets that could not be readily opened. Smith, Tr. 5/3/93 at 96–99. Some fire walls in basement and maintenance areas had holes in them. *Id.* at 103.

The CHA/HUD maintenance staff repairs smoke detectors on tenant request. Collins, Tr. 5/5/93 at 34. Of approximately 3,100 work orders in the three months prior to trial, only 23 were for broken, inoperable, or missing smoke detectors. Collins, Tr. 5/12/93 at 39. Collins has instructed his staff to replace or repair smoke detectors if they notice them missing or inoperative while working in a unit. Collins, Tr. 5/5/93 at 34–35. CHA/HUD relies on Chester housing inspectors to notify it if detectors are incorrectly located, but Collins did not know of any unit that had failed an inspection for that reason. *Id.* at 35–36. CHA/HUD was to inspect its smoke detectors within a month-and-a-half of trial during its HUD-mandated annual inspection. *Id.* at 36–37.

#### e. Lead–Based Paint

There was some lead-contaminated paint used at Lamokin Village and McCaffery Village. There was a lead abatement study recommending abatement at Lamokin Village on window sills, kitchen walls, closet shelf supports, interior door jams, baseboard quarter moldings, external handrails, lentils, entrance door headers, stair stringers and risers. Collins, Tr. 5/5/93 at 71. The study recommended testing or abatement at McCaffery Village on kitchen walls, stairwell walls, window sills, living room walls, closet shelves, exterior door casings, lentils, and handrails. *Id.*

Upon written notification accompanied by laboratory test results that a child under age 7 had an elevated lead blood level, CHA would either test the unit for lead or move the child's family to a lead-free unit. Def. CHA Ex. 41. If CHA/HUD chose to test the unit and found lead, CHA/HUD would abate the lead in the unit within fourteen days. *Id.* At time of trial, CHA/HUD defined an elevated blood lead level as 20 micrograms per deciliter rather than 25 micrograms per deciliter required by HUD regulations. Watts, Tr. 5/12/93 at 124–25.

Collins stated that he had been notified of only two children with elevated blood lead levels. Collins, Tr. 5/5/93 at 82. The director of the City of Chester's Lead Poisoning Prevention Program was aware of only one child with an elevated blood lead level living in a CHA unit. Odgen, Tr. 6/15/93 at 178.

The MROP proposals for Penn and Bennett include lead-based paint abatement. Watts, Tr. 5/12/93 at 107–07. The Comprehensive Grant ("Comp Grant") funding for Lamokin and Bennett also includes funds for lead-based paint abatement; however, abatement may not be completed until 1997. *Id.* at 192–93.

As of trial, CHA/HUD had nearly completed testing vacant units at Lamokin Village and McCaffery Village for lead-based paint; CHA/HUD planned to complete testing at Lamokin Village, McCaffery Village, Penn, and Bennett by the end of 1993. Watts, Tr. 5/12/93 at 124, 127. There was no evidence

of large amounts of flaking or peeling lead-based paint or large numbers of children with elevated blood lead levels;[3] on this record, it would not be necessary to move people out of units containing lead-based paint forthwith. Ewall, Tr. 5/11/93 at 164; Todd, Tr. 5/10/93 at 140–42, 178–80. The risk from lead-based paint could be managed until the units undergo modernization or reconstruction. Todd, Tr. 5/11/93 at 166.

#### f. Asbestos

Although there was asbestos in CHA buildings, most of the asbestos was located in boiler rooms, common building basements, or crawl spaces; only a small amount was present in residential areas. Todd, Tr. 5/11/93 at 154, 163. Most of the asbestos was not friable; the small amount of potentially friable asbestos on the ceilings of units at Chester Towers did not pose an immediate danger to residents. *Id.* at 159–60, 175–77. There was no evidence of asbestos in air samples; defendants' expert believed that sampling would have detected insignificant asbestos fiber levels. *Id.* at 173–74. The asbestos tiles present in some units did not pose an immediate threat to resident health. *Id.* at 174–75.

The asbestos at CHA did not require immediate removal. *Id.* at 159–60, 169–70, 172. CHA/HUD planned to conduct asbestos testing at Penn and Bennett as part of the MROP process. Watts, Tr. 5/12/93 at 101–02.

#### g. Overcrowding

In April, 1992, approximately 173 families were living in units that CHA/HUD considered too small for them. Brown, Tr. 5/6/93 at 132–37. CHA/HUD identified thirty-five "severely overcrowded families." Cayford, Tr. 6/14/93 at 165–66. CHA considered a family to be "severely overcrowded" if the family needed two additional bedrooms according to standard guidelines suggested by HUD and adopted by CHA. Henderson, Tr. 5/6/93 at 74–75.

CHA/HUD changed its Section 8 Administrative Plan to give priority to severely overcrowded families; CHA then mailed letters informing the thirty-five severely overcrowded families of the availability of Section 8 certificates and encouraging them to apply. Cayford, Tr. 6/14/93 at 166–67. Section 8 certificates entitle families to appropriately sized units in subsidized housing. *Id.* at 167. "Overcrowded families" that were not "severely overcrowded" were not invited to apply for Section 8 certificates. Henderson, Tr. 5/6/93 at 86. Seventeen of the severely overcrowded families applied for Section 8 certificates. Cayford, Tr. 6/14/93 at 167. Four families failed to comply with verification requirements; thirteen families were issued Section 8 certificates. *Id.* CHA/HUD sent these thirteen families a list of potential landlords in the area. *Id.* at 167–68.

CHA/HUD has rehabilitated or is in the process of rehabilitating eight four-bedroom units for occupancy by severely overcrowded families. *Id.* at 168. Every family requiring four bedrooms has been offered a four-bedroom unit, but some families have chosen not to accept the units offered. *Id.*

At time of trial, seven families remained on CHA/HUD's severely overcrowded list; two of these had applied for Section 8 certificates. *Id.* at 169. The families remaining on the severely overcrowded list and others considered severely overcrowded in the future will not be moved into larger units until completion of part of the modernization process. *Id.* at 169–70. CHA/HUD planned to create additional large units in the comprehensive modernization and reconstruction of CHA units. Henderson, Tr. 5/6/93 at 81.

#### 4. Modernization Plans

In 1992, HUD approved CHA applications for funds to improve conditions at CHA. On September 17, 1992, HUD approved $5,011,325 in Comp Grant funds, A.R. at 29713–14; in 1993, CHA/HUD received $5,800,000 in Comp Grant funds and was told that figure was an estimate of the amount it would receive for each of the next five years. Watts,

---

**3.** There was also no evidence on the number of children at the CHA projects who had been tested.

Tr. 5/12/93 at 111. On September 24, 1992, HUD approved CHA's MROP applications for $13,337,548 to renovate Penn and $22,556,265 to renovate Bennett. A.R. at 28906–07, 28902–03. The remainder of a previous 1988 allocation will provide approximately $2,200,000 in addition to reconstruct Penn. Watts, Tr. 5/12/93 at 123.

Although plans for reconstruction of Penn and Bennett were not final at the time of trial, CHA/HUD clearly was planning "phased" reconstruction. Pls.' Ex. 87 at 6, 10. Residents will be relocated within the development to vacate entirely one or more buildings; when the empty buildings have been reconstructed, tenants will be moved there and then vacant unrehabilitated buildings will be available for reconstruction. Nutt–Powell, Tr. 5/11/93 at 59–61. Replacing plumbing or wiring systems, or reconfiguring units by demolishing walls, cannot be performed while the buildings are occupied. Id. at 61. Using this phased approach, reconstruction at these developments is expected to take three-and-a-half to four-and-a-half years, id. at 59; Watts, Tr. 5/12/93 at 90–91; however, it is not possible to guarantee that the reconstruction will be completed even then. Nutt–Powell, Tr. 5/11/93 at 131.

Architecture and engineering ("A & E") firms have been selected for the reconstruction efforts at Penn and Bennett. Watts, Tr. 5/12/93 at 78–79. Ella Thompson and Yvonne Carrington, presidents of the tenant associations at Penn and Bennett, participated in the selections of these firms and were satisfied with the firms selected. Id. at 70–79. At time of trial, CHA/HUD believed that HUD approval of the A & E contracts was imminent. Id. at 80. After approval of the A & E contracts and notice to the firms, the A & E firms were to complete research and prepare schematics within six months. Id. at 92. The schematic designs were to be approved approximately 45 days thereafter. Id. Actual preparations of plans, specifications, and bid documents was expected to take an additional 90 days, followed by a 45 day period for reviewing bids. Id. CHA/HUD planned to put construction proposals out to bid within one year of the date of trial. Id.

CHA modernization plans for Lamokin Village include installation of a new heating system, new site lighting, major site work including storm water collection systems, upgrading kitchens, removal of asbestos in boiler rooms, and lead-based paint testing and abatement. Def. CHA Ex. 1 at 11. Plans for McCaffery Village include repair of sanitary and steam line leaks under the buildings, major site changes to control storm water, lead-based paint testing and abatement, increased exterior lighting, and site control through fencing and landscaping. Id. at 13. Plans for Chester Towers include repairs to heating systems and controls, improvements in site security, installation of smoke detectors, and phased replacement of bathrooms and kitchens. Id. at 8. There was no evidence that modernization at those developments would require those buildings to be vacant during the modernization process.

Assuming continuing yearly Comp Grant funding from HUD of $5.8 million per year, these funds will cover the costs of modernization for Lamokin and Chester Towers in six years and for McCaffery in seven years, Nutt–Powell, Tr. 5/11/93 at 83, but there is no certainty that the work will be completed within this time. Id. at 131. A few A & E contracts have been signed for the modernization of these projects; however, more contracts for design work will be necessary before CHA/HUD can spend funds on physical repairs and modernization. Id. at 182–83.

### 5. The ACC

The ACC is a contract between HUD and a PHA by which the PHA agrees to undertake certain obligations in return for HUD funding. Section 101 of the ACC states, "Each Project shall be undertaken in such a manner that it ... will be developed and administered to promote serviceability, efficiency, economy, and stability and to achieve the economic and social well-being and advancement of the tenants thereof." Section 201 of the ACC between CHA and HUD requires CHA to:

at all times operate each project (1) solely for the purpose of providing decent, safe, and sanitary dwellings (including neces-

sary appurtenances thereto) within the financial reach of Families of Low Income, (2) in such manner as to promote serviceability, efficiency, economy, and stability, and (3) in such manner as to achieve the economic and social well-being of the tenants thereof.

A.R. at 24240. Section 209 of the ACC states, "[CHA] shall at all times maintain each Project in good repair, order, and condition." A.R. at 24243. Subsection 510(B) of the ACC states, "Nothing in this Contract contained shall be construed as creating or justifying any claim against the Government by any third party other than as provided in subsection (A) of this Sec. 510." A.R. at 24286. Subsection 510(A) allows certain bondholders and the local housing authority to sue the Government to enforce the provisions of the ACC. *Id.*

Section 501 of the ACC states, "Upon the occurrence of a Substantial Default ... the Local Authority shall, at the option of the Government either (a) convey to the Government title to the Projects as then constituted ... or (b) deliver possession to the Government of the Projects as then constituted." A.R. at 24280. Section 502 requires CHA to deliver possession of the projects on demand by the Government upon a substantial breach of the ACC. *Id.*

Subsection 503(A) of the ACC states that the Government, after acquiring title or possession of the projects under sections 501 or 502, shall reconvey or redeliver the projects to the local authority as soon as practicable either after the Government is satisfied that all substantial breaches or defaults under the ACC have been cured and the projects will be administered in accordance with the ACC, or after the termination of the obligation of the Government to make annual contributions to the local authority. *Id.*

## B. DISCUSSION

### 1. Subsection 1437p(d)

Plaintiffs argue that CHA is liable under § 1437p for de facto demolition of CHA public housing units. Plaintiffs also argue that HUD is liable under 42 U.S.C. § 1437p for de facto demolition of CHA public housing

units as the oversight agency charged with enforcing § 1437p. Subsection 1437p(d) states: "A public housing agency shall not take any action to demolish or dispose of a public housing project or a portion of a public housing project without obtaining the approval of the Secretary and satisfying the conditions specified in subsections (a) and (b) of this section." Subsection 1437p(a) states in relevant part:

(a) ... The Secretary may not approve an application by a public housing agency for permission ... to demolish ... a public housing project or a portion of a public housing project unless the Secretary has determined that—

(1) ... the project or portion of the project is obsolete as to physical condition, location, or other factors, making it unusable for housing purposes, and no reasonable program of modifications is feasible to return the project to useful life; or in the case of an application proposing the demolition of only a portion of a project, the demolition will help to assure the useful life of the remaining portion of the project;

. . . .

Subsection 1437p(b) states the conditions under which the Secretary of HUD may approve an application or furnish assistance for demolition. Subsection 1437p(b)(1) requires that the demolition application have been developed in consultation with affected tenants and tenant councils; tenant councils, the resident management corporation, and tenant cooperative of any portion of the project covered by the demolition application must have been given an opportunity to purchase the project or portion of the project covered by the application. Subsection 1437p(b)(2) requires that all tenants to be displaced by the proposed demolition be relocated to other decent, safe, sanitary, and affordable housing. Subsection 1437p(b)(3) requires a PHA to have developed a plan to provide an additional decent, safe, sanitary, and affordable dwelling unit for each dwelling unit to be demolished, and sets out various requirements that the plan must satisfy.

Plaintiffs' liability claims under § 1437p present four issues: (1) whether a private right of action exists under § 1437p; (2)

whether a claim of "de facto demolition" falls within the scope of § 1437p; and, assuming affirmative answers to (1) and (2), (3) whether such an action can be maintained against CHA alone or against CHA and/or HUD; and (4) whether unapproved de facto demolition has taken place in this action.

### a. Private Right of Action

■ There is a private right of action to enforce § 1437p. Congress amended subsection (d) in response to *Edwards v. District of Columbia*, 821 F.2d 651 (D.C.Cir.1987); the Circuit Court of the District of Columbia had rejected a private cause of action for de facto demolition because § 1437p then imposed conditions precedent to the Secretary's approval of a demolition application but did not impose independent duties on a PHA.

The purpose of amendment was to clarify that:

> no [PHA] shall take any steps toward demolition and disposition without having satisfied the statutory criteria. This provision is intended to correct a erroneous interpretation of the existing statute by the United States Court of Appeals for the D.C. Circuit in *Edwards v. District of Columbia and shall be fully enforceable by tenants of and applicants for the housing that is threatened.*

H.R.Conf.Rep. No. 426, 100th Cong., 1st Sess. (1987), *reprinted in* 1987 U.S.C.C.A.N. 3317, 3469 (emphasis added). This is a clear statement of Congressional intent to allow a private right of action under § 1437p. *See Henry Horner Mothers Guild v. Chicago Hous. Auth.*, 780 F.Supp. 511, 513–14 (N.D.Ill.1991); *Tinsley v. Kemp*, 750 F.Supp. 1001, 1008–09 (W.D.Mo.1990); *Concerned Tenants Ass'n of Father Panik Village v. Pierce*, 685 F.Supp. 316, 320 (D.Conn.1988).

■ Because § 1437p(d) provides a federal right enforceable by tenants, plaintiffs may enforce its provisions under 42 U.S.C. § 1983.[4] *See Maine v. Thiboutot*, 448 U.S. 1,

4, 100 S.Ct. 2502, 2504, 65 L.Ed.2d 555 (1980) (Section 1983 encompasses claims based purely on federal statutory law); *Henry Horner*, 780 F.Supp. at 513–15; *Concerned Tenants*, 685 F.Supp. at 318–21.

### b. De Facto Demolition Under § 1437p(d)

■ Subsection 1437p(d) prohibits a PHA from taking any action to demolish public housing units without HUD approval, but "demolition" is not defined by statute. HUD has provided a regulatory definition of "demolition." 24 C.F.R. § 970.3. In reviewing an agency's construction of a statute it administers, a court must consider whether Congress has addressed the precise question at issue. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). "[I]f the statute is silent or ambiguous with respect to the specific issue," then the court must consider whether "the agency's answer is based on a permissible construction of the statute"; where the intent of Congress is clear, the court "must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–83, 104 S.Ct. at 2781.

■ The clear purpose of § 1437p is to preserve the number of available public housing units. The statute states that the Secretary may not approve a demolition application unless the Secretary finds that "the project or portion of the project is obsolete as to physical condition, location, or other factors, *making it unusable for housing purposes,* and no reasonable program of modifications is feasible to return the project or portion of the project to useful life." 42 U.S.C. § 1437p(a)(1) (emphasis added). The statute also requires that the PHA develop "a plan for the provision of an additional decent, safe, sanitary, and affordable dwelling unit for each public housing unit to be demolished or disposed under such application." 42 U.S.C. § 1437p(b)(3).

---

4. 42 U.S.C. § 1983 states in relevant part:
Every person who, under color of statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

HUD regulations define "demolition" as "the razing, in whole or in part, of one or more permanent buildings of a public housing project." 24 C.F.R. § 970.3. "Razing" is an extreme measure that virtually eliminates a building's physical structure; to "raze" is "to tear down completely; level to the ground." Webster's New World Dictionary 1116 (3rd College ed. 1988).

Housing units may become unusable for housing for reasons other than "razing." HUD's definition would allow a PHA to vacate an entire building and drastically reduce the number of units available for housing without triggering the mandatory statutory conditions precedent because the building itself had not been razed. The statute focuses on maintaining the number of available housing units; the HUD definition conflicts with the clear purpose of § 1437p.

HUD's regulatory definition of demolition as razing only is arbitrary. If a PHA proposed to raze a building to construct a new one in its place, the statute would clearly require that the proposal satisfy § 1437p(a) and (b). But under HUD's regulatory interpretation of the statute, if the interior of a building became functionally obsolete and underwent a lengthy and complete interior modernization and rehabilitation while entirely vacant, there would be no statutory obligation to satisfy § 1437p(a) and (b). These two situations are functionally equivalent in creating "new" housing units in the same physical space. It is arbitrary to distinguish housing that is "demolished" because the entire physical structure is destroyed from housing that is "demolished" because extensive interior reconstruction leaves only the exterior walls standing. In both cases, the inventory of public housing is diminished for a substantial period of time. HUD's definition cannot be sustained as a reasonable interpretation of the statute.[5]

### c. Agency Liability under § 1437p(d)

#### i. HUD Liability Under § 1437p(d) as Oversight Agency

■ Plaintiffs argue that a private right of action for de facto demolition under § 1437p(d) may be asserted against both CHA and HUD. The statute is clear in its allocation of duties to a PHA and to HUD in its general oversight of a PHA. Subsection 1437p(d) places a duty on a PHA to refrain from taking any steps toward demolition or disposition of housing units without submitting an application to HUD and obtaining HUD approval. This subsection does not place an affirmative duty on HUD to prevent demolition or disposition of housing units in its exercise of general PHA oversight.

■ By contrast, subsections (a) and (b) of § 1437p place an affirmative duty on HUD to refuse to approve a PHA application to demolish or dispose of public housing units unless certain requirements are met. HUD is not liable for any de facto demolition in its general supervision of a PHA unless HUD has approved such demolition in violation of statutory requirements; that decision would be subject to judicial review under the APA as a final agency decision. *See* 5 U.S.C. §§ 702, 706(1), 706(2)(A). Subsection 1437p(d) requires that a PHA not take steps to destroy housing without HUD approval; subsections 1437p(a) and (b) delineate the restrictions under which HUD may grant such approval.

Plaintiffs rely on *Tinsley* and *Henry Horner*. According to *Tinsley*, "HUD has the authority (and, plaintiff contends, the duty) to enforce housing regulations which would prevent such demolition by negligence." *Tinsley*, 750 F.Supp. at 1008. The district court refused to dismiss plaintiffs' claim against HUD under § 1437p(d). *Id.* In *Henry Horner*, the district court also found that HUD might be liable under § 1437p(d): "Although the statute does not expressly say

---

5. *See also Henry Horner Mothers Guild*, 780 F.Supp. at 514–15; *Concerned Tenants Ass'n of Father Panik Village*, 685 F.Supp. at 320–21 (de facto demolition need not require razing); *Tinsley*, 750 F.Supp. at 1007–08. HUD's regulatory definition of demolition was not discussed in these de facto demolition cases. *But see Dessin*

*v. Housing Auth. of Ft. Myers*, 783 F.Supp. 587, 590 (M.D.Fla.1990) (rejecting a claim of de facto demolition by relying on HUD's definition of demolition and on the "plain meaning" of the term), *vacated in part and rev'd in part*, 948 F.2d 730 (11th Cir.1991).

so, ... HUD's duty to enforce the statute is triggered when action to demolish is taken without HUD's approval. Any other interpretation would leave the section without a governmental mechanism of enforcement—a result contrary to Congress' intent to prevent the unapproved destruction of public housing." *Henry Horner Mothers Guild,* 824 F.Supp. at 819.

■ The court disagrees with *Tinsley* and *Henry Horner* that HUD in its general oversight capacity may be liable under § 1437p(d). If a PHA takes steps towards demolition without HUD approval, injunctive relief is available under § 1437p(d) because the purpose of § 1437p(d) is to prevent a PHA from destroying or disposing of public housing units without meeting the statutory preconditions for HUD approval. HUD approval is prohibited unless certain criteria are met, but the duty not to demolish or dispose of units without HUD approval is that of a PHA, not HUD. The private right of action under § 1437p(d) runs only against the local housing authority.

■ This interpretation comports with the legislative history of § 1437p(d), enacted to correct the *Edwards* court's conclusion that the statute imposed no duty on a PHA to refrain from disposing of public housing units without HUD approval; subsection (d) imposes such a duty on a PHA, and the private right of action established under that subsection is for violation of that duty only. There is no private right of action against HUD in its general oversight capacity.

### ii. HUD Liability as Operator of CHA

■ In the takeover of November 6, 1991, HUD took possession of CHA's assets and property and assumed oversight and control of CHA. CHA's Board of Commissioners agreed not to interfere with the operation of CHA by HUD's designee and was

left with only residual authority; reconstituting the Board was left to the sole discretion of HUD. However, HUD did not take title to CHA's assets and property.

HUD delegated all power necessary to run CHA's normal operations to Henderson, a HUD employee. Henderson has acted in the name of CHA, not HUD, in approving CHA contracts. No decision made by Henderson has been treated or processed any differently than if the decision had been made by CHA's Board of Commissioners. CHA has continued to operate under the statutory and regulatory requirements for a PHA. CHA employees did not become federal employees as a result of the takeover. Because HUD did not take title to the property and has continued to observe statutory and regulatory formalities applicable to PHAs with respect to the CHA projects, CHA remains a distinct legal entity operating the housing projects even after the HUD takeover of November 6, 1991.[6]

However, HUD has acted far beyond its general oversight authority with respect to CHA; HUD has taken possession and control of CHA. HUD has exercised direct control of CHA through Henderson, who was delegated "all power and authority necessary to oversee and control the entire operation" of CHA. A.R. at 19914. CHA's authority will be reinstated only when HUD reconstitutes CHA's Board and returns possession of the projects to CHA under section 503 of the ACC. HUD has complete discretion regarding the reconstitution of the CHA Board, and is obligated to return possession of the projects only when HUD is satisfied that the management of CHA satisfies the ACC.

While Henderson has acted in the name of CHA, HUD may be held liable for de facto demolition of CHA units as operator of CHA after the HUD takeover. In taking over the operations of CHA, HUD assumed the duties

---

6. HUD argues that certain clauses of the ACC would be rendered meaningless if CHA ceased to exist when HUD exercises its powers after a default or breach of the ACC. For instance, § 505(C) states that any indebtedness of CHA to the Government was not abrogated by a HUD takeover of CHA; § 503(A) states that the Government would redeliver possession of the projects to CHA after it found that all defaults and

breaches were cured or after the Government was no longer obligated to make annual contributions available to CHA. A.R. at 24282, 24280. While these ACC clauses may demonstrate an attempt to preserve CHA as a legal entity for financial purposes during the HUD takeover, they do not clarify the legal consequences of HUD's operation of the housing units after a HUD takeover.

of managing CHA in accordance with the governing statute. CHA continued as a formal entity with title to CHA projects, but actual operation and control of the projects rested with HUD after the November 6, 1991 takeover, and obligations imposed pursuant to statutory authority on a PHA devolved on HUD by operation of law.

### d. De Facto Demolition at CHA

■ CHA/HUD had and has a policy to remove units from use as they become vacant. CHA/HUD believe financial and planning reasons justifies not performing interim repairs because the units will be undergoing comprehensive modernization and reconstruction in the next several years. This policy has resulted in substantial numbers of vacant units, and substantial numbers of units will continue to be vacant during reconstruction and modernization. Because the total number of available housing units has been and will be greatly diminished for a substantial period, housing units have been de facto demolished. In the absence of the findings by the Secretary required by § 1437p(a) and the satisfaction of the requirements of § 1437p(b), including submission and approval of a plan to provide an additional public housing unit for each demolished unit pursuant to § 1437p(b)(3), the functional demolition of these units violates § 1437p(d).

The policies and plans instituted at CHA/HUD demonstrate intent to make units functionally unavailable for housing purposes for a substantial period of time with no provision to maintain the number of available public housing units. CHA/HUD has adopted a specific policy intended to keep units vacant for a substantial time in preparation for and/or during the modernization and reconstruction process. The reconstruction plans at Penn and Bennett intentionally and substantially reduce the number of available housing units for many years during the proposed phased reconstruction. CHA/HUD has acted with the intent to make some units functionally unavailable for housing purposes and engaged in intentional de facto demolition of those units.[7]

■ Before approving a plan for demolition of housing units, the statute requires the HUD Secretary to find that the units are "obsolete" and that "no reasonable program of modifications is feasible to return the project to useful life." 42 U.S.C. § 1437p(a). According to defendants, the reconstruction plans demonstrate that CHA's units can be returned to useful life so a finding that the units qualify for demolition is precluded. HUD claims that MROP constitutes a "reasonable program of modifications"; since and Penn and Bennett qualified for a total of $35,893,813 in MROP funds, units at these developments are not "obsolete."

■ The "O" in "MROP" stands for "Obsolete"; MROP funds are available for obsolete units. "MR" stands for "Major Reconstruction"; "major reconstruction" constitutes more than a "reasonable program of modifications." Perhaps Congress did not pay careful attention to the language used in labeling this funding program, but the court need not rely on the label alone. The plans for Penn and Bennett anticipate that entire buildings will be empty during reconstruction. Defendants plan to replace plumbing, wiring, and heating systems and may reconfigure units by removing and reconstructing interior walls. These measures are certainly

---

7. However, plaintiffs need not show that CHA or HUD intended to de facto demolish housing units. Neither the statute nor the legislative history explicitly require a "plan" or an intent to demolish. *See Henry Horner Mothers Guild v. Chicago Hous. Auth.*, 824 F.Supp. 808, 818–19 (N.D.Ill.1993) (intent is not a necessary element of a claim under § 1437p(d)). *But see Gomez v. Housing Auth. of El Paso*, 805 F.Supp. 1363, 1375–76 (W.D.Tex.1992) (requiring plaintiffs to show that the housing authority has a "policy" or that the housing authority "purposely allowed ... units to become uninhabitable or violated HUD regulations"). Subsection 1437p(b)(3) prohibits HUD from approving demolition or disposition of public housing units unless the PHA has a plan to provide an additional public housing unit for each unit it seeks to demolish. The clear intent of this subsection is to prevent any reduction in available public housing units. It applies when a PHA intentionally removes housing units from service and when a PHA unintentionally allows conditions to deteriorate so that the housing units are functionally unavailable. Allowing the removal of available public housing units through inadvertent or deliberate neglect violates the congressional directive to maintain the number of available units.

more than a "reasonable program of modifications." Every approval of MROP funds for housing units may not necessarily imply that the Secretary could have approved a plan to demolish those units; a determination that units are "obsolete" and that "no reasonable program of modifications is feasible to return the project to useful life" depends on an evaluation of conditions of specific units, not on the source of their modernization funding. Qualification for those funds does not necessarily preclude or compel a finding that the units satisfy the criteria for demolition under § 1437p(a).

■ There has been no HUD determination that CHA units are or are not obsolete even though some units have been vacant for a considerable amount of time and will continue to be vacant until the lengthy and extensive modernization and reconstruction programs are completed. The staged construction at Bennett and Penn will require that entire buildings be empty on a sequential basis for the duration of a construction period of approximately four-and-a-half years. Penn and Bennett will have high vacancy rates even though the actual vacant units will vary over the long time needed for reconstruction.[8] Removal of so many units for such a long time and the increasingly high vacancy rates violate the statutory mandate requiring a plan to maintain the total amount of available public housing units and not remove those units from the housing rolls.

■ CHA/HUD's reconstruction and modernization plans in lieu of actual demolition may ensure the best long-term potential for the developments; the court will not substitute its own judgment for that of CHA and HUD where the parties appear to have considered and studied many possible alternatives. But a plan to raze and reconstruct buildings on a rotating basis would be prohibited without HUD approval under § 1437p(d); the CHA/HUD plan accomplishes the same prohibited result even though the exterior walls are left standing, so the same approval requirement and prerequisites apply.

■ The occupied units may not have been de facto demolished at the time of trial. There is no doubt that many of the occupied units are in extremely poor condition.[9] Some of the problems were the result of deferred or inadequate maintenance in individual units and general failure to maintain basic utility systems. Vandalism contributed to the difficulty in maintaining units. There also appeared to be ·a problem with fire safety, though the parties disputed whether CHA or its tenants had the responsibility for maintaining smoke detectors. Many of the units could not be considered "decent, safe, and sanitary."

However, a unit that is not decent, safe, or sanitary is not necessarily functionally demolished. Plaintiffs have urged the court to equate "demolished" with "uninhabitable." "Habitability" is a legal term of art meaning that the premises are free from serious defects to health and safety; most states determine whether a landlord has fulfilled an implied or express "warranty of habitability" by compliance with building and sanitation codes. See Black's Law Dictionary 710 (6th ed. 1990); Codified Ordinances of Chester, Art. 1723.02(q) (defining "Unfit for human habitation" as "any rental dwelling unit which violates any of the City Codes"). While a building code violation may render a unit legally "uninhabitable," it does not necessarily mean that the unit is the functional equivalent of "demolished." Plaintiffs did not demonstrate the existence of significant dangers from inadequate fire safety, asbestos, lead paint, or other environmental concerns posing immediate and significant threats to the health of all CHA tenants. While the fire safety issue provides some cause for concern, the court cannot conclude that the poor physical condition of the occu-

---

8. It is unclear whether the units in Chester Towers, McCaffery Village, and Lamokin Village will be vacant until the end of the approximately six-year modernization programs or whether some repairs are contemplated without need for a high vacancy rate at those developments.

9. This is with the possible exception of Chester Towers, which appeared to be in better condition than the other developments.

pied units render all of them functionally demolished at the present time.

CHA/HUD is not liable under § 1437p(d) for taking "any action to demolish" the occupied housing units per se. While previous CHA action or inaction allowed many units to decline to deplorable conditions, CHA/HUD is not now taking any action to demolish units while they are occupied; since the HUD takeover, CHA/HUD has been making a good faith effort in the face of difficult conditions to maintain its occupied units pending comprehensive reconstruction and modernization of all CHA units. Because CHA/HUD attempted to improve conditions in occupied units, CHA/HUD did not take "actions" to demolish those units while occupied.[10] However, CHA/HUD did act to demolish units by adopting a policy allowing units to remain vacant after their occupants' departure. Although CHA/HUD may have adopted this policy with the ultimate intent to improve future living conditions, CHA/HUD cannot avoid the statutory mandate to preserve the total number of available public housing units by passively waiting for units in need of maintenance to become vacant instead of actively rehabilitating even if it required displacing and relocating tenants to alternative decent, safe, sanitary and affordable housing.

Plaintiffs are entitled to relief even though some occupied CHA units may not have been de facto demolished. Congress stated that the private right of action under § 1437p(d) "shall be fully enforceable *by tenants* of and applicants for the housing that is threatened." H.R.Conf.Rep. No. 426, 100th Cong., 1st Sess. (1987), *reprinted in* 1987 U.S.C.C.A.N. 3317, 3469 (emphasis supplied). Furthermore, plaintiffs have suffered harm from the de facto demolition of units at CHA: the high number of vacancies has contributed to the generally poor conditions of occupied units, and the CHA/HUD decision to improve all units through long-term reconstruction and modernization, while perhaps cost-effective, has resulted and will continue to result

in delay in providing improved living conditions to the plaintiff class.

### 2. HUD Liability Under the APA

Plaintiffs' APA claims against HUD focus on 42 U.S.C. § 1437p(a) and (b) setting the conditions under which HUD may approve a PHA's application to demolish a project or a portion of a project. Plaintiffs argue that HUD's "approval" of the alleged de facto demolition was arbitrary and capricious because "HUD had knowledge of the conditions [at CHA], took no action to halt the de facto demolition, and endorsed the de facto demolition by continuing to fund CHA at a steady or increasing level during the period of HUD's knowledge of de facto demolition." Pls.' Trial Mem. at 55.

The APA allows review of "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. The court has found that CHA and HUD as operator of CHA engaged in de facto demolition of housing units. The APA permits actions only for injunctive relief, 5 U.S.C. § 702, so there is no remedy against HUD as HUD that is not available against CHA and HUD as the operator of CHA. Plaintiffs have not shown how an injunctive remedy against HUD under the APA would provide additional relief. Relief against CHA and HUD as the operator of CHA is allowed by law and constitutes an adequate judicial remedy precluding review of HUD actions or inactions under the APA.

### 3. Third Party Beneficiary Status Under the ACC

Count VI of the Second Amended Complaint alleges that CHA breached the ACC between CHA and HUD; plaintiffs argue that both CHA and HUD are liable to plaintiffs as third party beneficiaries of the ACC. Federal common law governs plaintiffs' third party beneficiary status because a uniform national rule is necessary to further the interests of the Federal Government. *See Miree v. DeKalb County,* 433 U.S. 25, 29,

---

**10.** The court does not reach the question of whether the occupied units could have been considered functionally or de facto demolished if

CHA/HUD had failed to take action to halt the physical deterioration of those units.

97 S.Ct. 2490, 2493, 53 L.Ed.2d 557 (1977). In *Miree*, federal common law did not apply to plaintiffs' third party beneficiary claim under a contract between a municipality and the Federal Aviation Administration because "the litigation is among private parties and no substantial rights or duties of the United States hinge on its outcome." *Id.* at 31, 97 S.Ct. at 2495.

Here, the United States is a party. The United States may incur substantial obligations if tenants of local housing authorities may enforce the ACC between HUD and the local authority. *See Henry Horner Mothers Guild v. Chicago Hous. Auth.*, 780 F.Supp. 511, 515 n. 4 (N.D.Ill.1991); *Concerned Tenants Ass'n of Father Panik Village v. Pierce*, 685 F.Supp. 316, 323 (D.Conn.1988). The interests of the United States may be impaired if its susceptibility to suit varies according to the third party beneficiary rules of different states. *See Boyle v. United Technologies Corp.*, 487 U.S. 500, 508, 108 S.Ct. 2510, 2516, 101 L.Ed.2d 442 (1988) (where the federal interest requires a uniform rule, the entire body of state law applicable to the area conflicts and is replaced by federal rules). Federal common law controls the issue of whether CHA tenants may recover under the ACC.

■ "Under settled principles of federal common law, a third party may have enforceable rights under a contract if the contract was made for his direct benefit." *Holbrook v. Pitt*, 643 F.2d 1261, 1270 (7th Cir.1981). Some sections of the ACC express an intent to benefit the tenants directly. Section 201 requires CHA to operate the projects "solely for the purpose of providing decent, safe, and sanitary housing ... and in such manner as to achieve the economic and social well-being of the tenants thereof." Section 209 of the ACC states that "[CHA] shall at all times maintain each Project in good repair, order, and condition." Section 101 of the ACC states, "Each Project shall be undertaken in such a manner that it ... will be developed and administered to promote serviceability,

efficiency, economy, and stability and to achieve the economic and social well-being and advancement of the tenants thereof." [11]

■ However, subsection 510(B) states, "Nothing in this Contract contained shall be construed as creating or justifying any claim against the Government by any third party other than [certain bondholders and the local housing authority]." This language explicitly prohibits tenants from enforcing the ACC against HUD as third party beneficiaries. The Circuit Court for the District of Columbia in *Ashton v. Pierce*, 716 F.2d 56, 66 (D.C.Cir.1983), allowed tenants to recover against HUD as third party beneficiaries despite the restrictive language of subsection 510(B) because it found no evidence that subsection 510(B) was intended to apply to tenants and, "[a]ssuming that the parties can contract away the third-party beneficiary's right to enforce the contract, the intention to do so must be more clearly expressed than it is in section 510(B)." Even though the District of Columbia Circuit allowed tenants to recover against HUD as third party beneficiaries in *Ashton*, the court in *Samuels v. District of Columbia*, 770 F.2d 184 (D.C.Cir. 1985), was more skeptical of tenants' federal rights against a local housing authority. After stating that 42 U.S.C. § 1983 probably would not support a private right of action for tenants seeking to enforce the "decent, safe, and sanitary dwellings" language of 42 U.S.C. § 1437 against a PHA, the court discussed the implications of allowing an action to proceed under the ACC against a PHA:

> Nothing in the language or history of the Act indicates that Congress intended the broad policy provisions of the Act to create a federal remedy for every aspect of public landlord-tenant relations, and we would be extremely reluctant to read those provisions to create a federal warrant of habitability enforceable under section 1983 in individual landlord-tenant disputes. To the extent that the plaintiffs' third-party beneficiary theory could be extended to establish a federal cause of action for such

11. This portion of the contract appears to apply to development of projects within a PHA rather than to its maintenance and operation; but even to the extent that this section directly benefits the plaintiffs, it does not affect the analysis of plaintiffs' right to recover under the ACC as third party beneficiaries.

discrete and random disputes, we think it would be plainly inconsistent with the structure of federal housing law.

*Samuels*, 770 F.2d at 201 n. 14 (citation omitted).[12]

This court disagrees with *Ashton 's* conclusion that section 510 of the ACC lacks clarity; it clearly expresses the parties' intent to limit third party actions against HUD. Allowing tenants to enforce the broad language of ACC sections 101 (projects shall be "developed and administered to promote serviceability, efficiency, economy, and stability and to achieve the economic and social well-being and advancement of the tenants thereof"), 201 (CHA shall operate the projects "solely for the purpose of providing decent, safe, and sanitary housing ... and in such manner as to achieve the economic and social well-being of the tenants thereof"), and 209 (CHA "shall at all times maintain each Project in good repair, order, and condition") would give tenants a federal action for relatively minor breaches of leases between tenants and their local housing authority, a result inconsistent with the structure of federal housing law contemplated by Congress. The contract's

broad, precatory language expressing an intent to benefit plaintiffs in sections 101, 201 and 209 is insufficient to allow plaintiffs to sue as third party beneficiaries under the ACC.[13] Plaintiffs may not recover against HUD, CHA, or CHA/HUD as third party beneficiaries of the ACC.[14]

### 4. Lease Violations

Count X of the Amended Complaint alleges that CHA violated the Housing Act by including a lease provision requiring tenants to pay for necessary repairs in advance and by adopting a policy requiring tenants to pay for repairs caused by normal wear and tear or uncontrollable acts of third parties. There was no evidence that CHA enforced the provision of the lease requiring residents to pay for repairs in advance, nor was there evidence that CHA had a policy of charging tenants for repairs.

 Plaintiffs argue that CHA violated individual leases requiring CHA to comply with applicable codes and regulations and to keep units in a clean and safe condition. While individual lease violations may be ad-

---

**12.** It is unlikely that Congress intended to create a federal warranty of habitability for HUD-financed housing. *See Gibson v. Gary Hous. Auth.*, 754 F.2d 205, 206 (7th Cir.1985) (no warranty of habitability for HUD-regulated and subsidized housing); *Alexander v. United States Dep't of Hous. and Urban Dev.*, 555 F.2d 166, 171 (7th Cir.1977) (no warranty of habitability for HUD-owned housing), *aff'd*, 441 U.S. 39, 99 S.Ct. 1572, 60 L.Ed.2d 28 (1979); *Perez v. United States*, 594 F.2d 280, 287 & n. 11 (1st Cir.1979) (no affirmative statutory duty on HUD to guarantee safety of HUD-financed housing); *Hurt v. Philadelphia Hous. Auth.*, 806 F.Supp. 515, 527 (E.D.Pa.1992); *Kingston Square Tenants Ass'n v. Tuskegee Gardens, Ltd.*, 792 F.Supp. 1566, 1574 (S.D.Fla.1992). Some courts have allowed tenants to seek equitable relief against HUD on a theory of an implied warranty of habitability; in these cases, however, HUD either owned the projects or was the mortgagee in possession of the property. *See Conille v. Secretary of Hous. and Urban Dev.*, 840 F.Supp. 105, 113–17 (1st Cir. 1988); *Chase v. Theodore Mayer Bros.*, 592 F.Supp. 90, 100–01 (S.D.Ohio 1983); *Techer v. Roberts–Harris*, 83 F.R.D. 124 (D.Conn.1979).

**13.** *See also Hurt v. Philadelphia Hous. Auth.*, 806 F.Supp. 515, 524–27 (E.D.Pa.1992) (discussing the distinction between precatory policy language and specific substantive language creating

enforceable rights). ACC provisions relating to "decent, safe, and sanitary housing," "the economic and social well-being of the tenants," and the maintenance of "each Project in good repair, order, and condition" were not intended by Congress to bring landlord-tenant disputes into federal court.

**14.** Federal courts have divided over this issue. In *Perry v. Housing Auth. of Charleston*, 664 F.2d 1210, 1218, 1218 n. 16 (4th Cir.1981) the court found that tenants were not third party beneficiaries of the ACC, and disposed of the issue without remanding to the district court. *See also Kingston Square Tenants Ass'n v. Tuskegee Gardens, Ltd.*, 792 F.Supp. 1566, 1573 (S.D.Fla.1992); *Boston Public Hous. Tenants' Policy Council, Inc. v. Lynn*, 388 F.Supp. 493 (D.Mass.1974). But the Circuit Court for the District of Columbia in *Ashton v. Pierce*, 716 F.2d 56, 66 (D.C.Cir.1983) found third party beneficiary status and stated that "it is difficult to imagine any purpose for the Contract other than to benefit the tenants of public housing." *See also Henry Horner Mothers Guild v. Chicago Hous. Auth.*, 780 F.Supp. 511, 515 n. 4 (N.D.Ill.1991); *Tinsley v. Kemp*, 750 F.Supp. 1001, 1012 (W.D.Mo.1990); *Curtis v. Housing Auth. of Oakland*, 746 F.Supp. 989, 997 n. 17 (N.D.Cal.1990); *Concerned Tenants Ass'n of Father Panik Village v. Pierce*, 685 F.Supp. 316, 323 (D.Conn.1988).

dressed through standard landlord-tenant litigation, such claims are inappropriate in this class-based action. Moreover, lease violations are not in themselves probative of de facto demolition; the failure of CHA to make a repair or to cure a safety defect does not automatically render a unit functionally demolished.

Any fact in the Discussion section not set forth in the Findings of Fact are incorporated therein.

Although plaintiffs may not enforce the ACC as third party beneficiaries, may not assert individual lease violations in this action, and are precluded from obtaining relief under the APA, plaintiffs have succeeded in proving de facto demolition of CHA housing units by CHA and HUD as operator of CHA in violation of 42 U.S.C. § 1437p(d). Having found liability, the issue of remedy remains.

In view of the discretionary nature of equitable remedies and the lack of precedent, the court has determined to permit the parties to propose appropriate remedial action. The parties may wish to consider: (1) whether alternative housing should be provided to bring CHA in conformance with HUD regulations, particularly with regard to vacancy rates and elapsed time for reoccupancy in the event of vacancy, or to enable relocation of class members for more expeditious and prompt reconstruction; and (2) whether a receiver should be appointed to prevent further de facto demolition and enable a more expeditious and prompt reconstruction. Following a reasonable period for such submissions, a hearing will be held at the convenience of the court.

## C. CONCLUSIONS OF LAW

1. This court has jurisdiction over the subject matter and parties under 28 U.S.C. §§ 1331 and 1343(a)(3).

2. Plaintiffs have a private right of action against CHA/HUD for de facto demolition pursuant to 42 U.S.C. § 1437p(d).

a. Plaintiffs may enforce a private right of action provided by 42 U.S.C. § 1437p(d) against CHA under 42 U.S.C. § 1983.

b. Plaintiffs may enforce a private right of action provided by 42 U.S.C. § 1437p(d) against HUD as operator of CHA under 42 U.S.C. § 1983.

c. Plaintiffs may not enforce a private right of action against HUD, as the agency charged with general oversight of PHAs, for de facto demolition.

3. Plaintiffs may not enforce sections 101, 201, and 209 of the ACC between HUD and CHA as third party beneficiaries.

4. The high number of vacancies at CHA before the HUD takeover of November 6, 1991, the policy not to rehabilitate vacant units for occupancy adopted after November 6, 1991, and vacancies planned during the planned modernization and phased reconstruction plans over the next four to five years constitute illegal de facto demolition by CHA.

5. CHA and HUD as the operator of CHA after November 6, 1991, are liable for de facto demolition of CHA.

6. Tenants in occupied units at CHA have been adversely affected by the de facto demolition of CHA units.

7. Plaintiff class is entitled to relief for de facto demolition.

8. The remedy against CHA and HUD as operator of CHA for de facto demolition constitutes an adequate judicial remedy precluding review of HUD actions or inactions under the APA. 5 U.S.C. § 704.

## ORDER

AND NOW, this 29th day of April, 1994, it is ORDERED that:

1. Chester Housing Authority and Jacquelyn M. Pryor, in her official capacity as Executive Director of the Chester Housing Authority are liable to the plaintiff class for de facto demolition of housing units at Chester Housing Authority.

2. United States Department of Housing and Urban Development and Henry Cisneros, in his official capacity as Secretary of the United States Department of Housing and Urban Development, are liable to the plaintiff class for de facto demolition of housing units at the Chester Housing Authority as

operators of the Chester Housing Authority after November 6, 1991.

3. Plaintiffs' claims under the Fair Housing Act and Title VI of the Civil Rights Act have been DISMISSED with prejudice.

4. Count I of the Second Amended Complaint has been DISMISSED as moot.

5. HUD's Motion for Judgment Pursuant to Rule 52 is DENIED as moot.

6. The parties may submit proposed remedies on or before May 20, 1994. A hearing will be held thereafter at the convenience of the court.