**In re Linda DAY, Debtor.**

**In re Linda DRIGGINS, Debtor.**

**In re Bettie WHITAKER, Debtor.**

**Bankruptcy Nos. 96–15751DAS, 96–16437DAS and 96–17563DAS.**

United States Bankruptcy Court, E.D. Pennsylvania.

May 15, 1997.

See also 850 F.Supp. 1257.

Roger V. Ashodian, Chester, PA, for Debtors Driggins and Day.

Sharon Oris Morgan, Caplan & Luber, L.L.P., Paoli, PA, for Receiver of Chester Housing Authority.

Bettie Whitaker, Chester, PA, Debtor pro se.

Edward Sparkman, Philadelphia, PA, Standing Chapter 13 Trustee.

## OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

In this Opinion, we address several issues common to three Chapter 13 cases filed by public housing tenants within six years of their having filed Chapter 7 cases in which they previously received discharges.

We grant the Objection of the Chester Housing Authority ("the CHA") by its receiver, Robert C. Rosenberg, Esquire, to confirmation of the Debtors' plans, since they con-

template only nominal payments to the CHA. We hold that, in Chapter 13 cases like these, which are essentially serial successors to Chapter 7 cases, the CHA's allowed claims for rents accruing subsequent to the Debtors' prior discharges must be paid in full under the Debtors' Chapter 13 plans.

However, we reject the CHA's contention that we must defer our claims process to an arbitration procedure established for the CHA's tenants in a pending federal class action brought against the CHA by its tenants. We also reject the CHA's contention that there is no warranty of habitability applicable as to it, and we will sustain in part the Debtors' Objections to these claims on this basis. Finally, we reject the CHA's argument that the Debtors are obliged to assume their leases to retain their public housing tenancies, reaffirming our holdings in *In re Sudler*, 71 B.R. 780, 786–87 (Bankr. E.D.Pa.1987), that public housing tenants are protected by 11 U.S.C. § 525(a) and that a public housing tenant can generally retain a premises despite the failure of the case trustee to assume the lease or, except where a prior Chapter 7 discharge was obtained in a previous case instituted within six years of a refiling, paying dischargeable rent.

As a result of these holdings, we will carry, to an anticipated final confirmation hearing date of June 19, 1997, the CHA's motions for relief from the automatic stay to proceed under applicable nonbankruptcy law against the Debtors.

## B. PROCEDURAL AND FACTUAL HISTORY

Before we discuss the individual circumstances of the three Debtors before us, we note certain elements common to all three cases that bear mentioning, first among which is the status of the aforementioned federal class action against the CHA. Subsequent to the filing of this action, in which the District Court found that the CHA was liable for a "de facto demolition" of a substantial amount of the CHA's housing stock in a decision reported as *Velez v. Cisneros*, 850 F.Supp. 1257 (E.D.Pa.1994), the CHA was placed in receivership by the United States Department of Housing and Urban Develop-ment ("HUD") as a "Troubled Housing Authority." *Id.* at 1259–60.

On February 24, 1995, a partial settlement in the *Velez* case was approved by the District Court, per the Honorable Norma L. Shapiro ("the Settlement"), which purported to globally resolve the rent arrearage and maintenance disputes outstanding between the CHA and many members of the plaintiff class of CHA residents. Through the Settlement it was agreed that the CHA would grant all tenants who executed documents to participate in the Settlement a one hundred (100%) percent rent abatement for all arrears due prior to January 1, 1992, followed by a fifty (50%) percent abatement of all arrearages due from January 1, 1992, to August 31, 1994. Thereafter, tenants would be obligated to pay their full rent plus an extra amount toward the arrears at the rate of the greater of five (5%) percent of their income or $15.00 monthly. Tenants could choose to become parties to the Settlement by individually executing "Repayment/Repair Agreements" with the CHA and, as part of the Settlement, tenants were to submit to the CHA a list of items to be repaired. If the repairs were not made within a 60–day period, the tenants' obligations to pay rent were to be suspended.

The parties agree that, at some time subsequent to the Settlement, Judge Shapiro entered a further Order of December 20, 1995, appointing a master to arbitrate CHA evictions in order to effect an arbitration provision added in a new CHA lease form. In that Order, Federal Magistrate Judge M. Faith Angell was appointed as master. We now address the procedural histories and facts adduced at hearings of March 18, 1997, and April 1, 1997, with respect to each of the Debtor-tenants against this background.

### Linda Driggins

LINDA DRIGGINS has been a CHA tenant for seven years, residing throughout that time in a three-bedroom McCafferty Village unit at 2904 Knight Place, Chester, Pennsylvania 19013. Driggins filed bankruptcy on two occasions prior to filing the instant case. On July 13, 1994, she filed under Chapter 7 and received a discharge in November of that year. At or about the time of her

Chapter 7 filing, simultaneous to being in Chapter 7, Driggins also filed a case under Chapter 13 which was ultimately dismissed. Following the Chapter 7 discharge, Driggins only rarely, if ever, paid rent and has accumulated substantial post-discharge arrearages, amounting to $3,915.27 as of July 11, 1996, when she filed her instant case *pro se* under Chapter 13.

Driggins testified that a local tenants council assisted her and the two other instant Debtors, who live in her same block, in their bankruptcy-filings. Driggins' Plan, filled out on the same form as the other Debtors' plans, contemplates payments of $25 monthly to the trustee for 3 years and fails to designate any anticipated distribution.

The CHA filed, as it did in almost the same form in the other Debtors' cases, comprehensive Objections to Driggins' Plan on January 15, 1997, the day before her first scheduled confirmation hearing. The confirmation hearing was continued to February 13, 1997. On that date, Roger V. Ashodian, Esquire, of Delaware County Legal Assistance Association, an agency providing free legal services in civil cases to low-income persons, appeared and requested permission to file a "limited appearance" for Driggins and Debtor LINDA DAY. We allowed this request of Ashodian, though extraordinary, because it was apparent that Driggins and Day needed legal assistance, having received very little practical insight into what they needed to obtain plan confirmation by the tenants counsel which had "assisted" them; no issue of fees for partial service was presented; and the CHA did not oppose Ashodian's request, presumably to attempt to globally resolve, with counsel involved in the *Velez* case, certain issues which would probably recur in cases of other tenants. The parties agreed to continue the confirmation hearings until March 6, 1997.

On the latter date, the parties agreed to a further continuance of these hearings, until March 18, 1997, which we allowed only on the condition that no further continuances would be allowed. They also desired to put before us on March 18, in hearings consolidated with the confirmation hearings, motions of the CHA for relief from the automatic stay ("the Motions") and Objections of the Debtors to the CHA's amended proof of claim ("the Objections"), which were not then filed but which were subsequently filed on March 13, 1997. We also placed the case of *pro se* Debtor BETTIE WHITAKER, for whom Ashodian did not seek to enter his appearance in any sense, on the same track.

The consolidated hearing was commenced and completed as to Driggins on March 18, 1997. The Day and Whitaker hearings were continued to and completed on April 1, 1997. A post-trial briefing schedule was established and, after several extensions, was completed on May 7, 1997.

Driggins testified to residing in a grossly-overcrowded apartment, as her family has grown to include seven minor children. She sleeps with her youngest child in one bedroom, three other daughters occupy another bedroom, two sons sleep in the third bedroom, and her oldest daughter sleeps in the living room. The CHA has acknowledged for several years that Driggins' three-bedroom unit is overcrowded and promised to assist her in obtaining a five-bedroom unit through an alternative federally-subsidized housing program, because the CHA owns no units with more than four bedrooms. However, Driggins has never been offered a larger unit.

In addition to overcrowding, Driggins described a variety of maintenance problems in her apartment, most prominently cracks in her stairs; a weak ceiling in her kitchen, which has fallen down once and she believes may be coming down again; loose tiles on her living room floor; a defective electrical outlet in her living room which at one time caused her son to be "electrocuted" in a serious but nonfatal accident; and, for the last two winters, a persistent lack of heat. This last problem began, ironically, after the CHA installed a new boiler in her building. At this point the CHA acknowledges that the boiler is defective but has indicated that it is not going to repair or replace it again because the building is scheduled for demolition.

The CHA admitted into evidence a voluminous number of maintenance orders for Drig-

gins' unit. These work orders cover a large number of defective conditions in the unit, including a variety of leaks and electrical and structural problems occurring over the last several years. To the CHA's credit the reports indicate that many necessary repairs were completed, notably that Driggins received a new stove. On the other hand, however, the sheer number of work orders suggests that Driggins' unit, even when repaired, is in a fragile and dilapidated condition.

Driggins was the only one of the three instant Debtors who did not sign a Repayment/Repair Agreement pursuant to the *Velez* Settlement. Prior to her bankruptcy filing, the CHA attempted to evict Driggins and she participated in a hearing before Judge Angell pursuant to the arbitration procedure established in *Velez*. On March 8, 1996, Judge Angell entered a Notice of Disposition stating only that the CHA should verify Driggins' position on the transfer list for a larger unit and relist the matter if she were not moved into a larger unit in 60 days, or by May 8, 1996. The latter date came and went with no disposition. The Debtor thereafter filed her bankruptcy.

On February 1, 1997, the CHA filed an amended proof of claim against Driggins for a total of $4,583.27, consisting of $3,915.27 of unsecured debt and $668 of post-petition priority debt. The Debtor, per Ashodian, has objected to the claim, asserting that the total amount due has been miscalculated and that she is entitled to a rent abatement based on breaches of the warranty of habitability and the failure of the CHA to provide her relief from being overcrowded. Driggins did not deny that, since August 1992, she submitted her monthly rent of $167 to the CHA only on March 8, 1996; December 9, 1996; and January 10, 1997. She claimed that she was prepared to remit her March and April 1997 rent payments.

*Linda Day*

Day also resides in McCafferty Village, at 2911 Knight Place, Chester, Pennsylvania. She filed two previous bankruptcies, the first being a Chapter 7 case in 1992 in which she received a discharge and the second being a Chapter 13 case in 1993, which was dis-

missed. Day's present case was filed *pro se* under Chapter 13 on June 24, 1996. Day filed a plan contemplating payments of $10 per month to the trustee for 36 months. The CHA objected to the plan and filed an amended proof of claim for $10,695.19, consisting of an unsecured amount of $8,597.19 and a priority debt of $2,098. Day, per Ashodian, has objected to the claim, alleging that the amount is improperly calculated by not taking into account the rent abatements she should have received under a Repayment/Repair Agreement which she executed pursuant to the *Velez* Settlement and alleging continuing violations of the warranty of habitability pertinent to her unit.

Day does not deny, however, that she paid the CHA very little rent over the last several years. The record supports the conclusion that, although Day's rent was fixed at $333/month until a reduction to $252 effective in April 1997, she paid only two small payments totalling about $66 in 1994; $233 on October 28, 1996; and $333 on March 5, 1997. Day claimed that she was prepared to make her April payment.

As to the condition of her unit, Day alleges numerous defects, including a weak back door that will not securely lock; a weak and sloping kitchen floor; a leak under the kitchen sink; a loose board in her living room floor; three or more cracked steps in stairs to second floor, a sticking front door; a foul odor constantly emanating from her basement; kitchen cabinets that are about to fall from the wall; and, as might be expected, lack of adequate heat due to her residence on the same block as Driggins. While the CHA's records indicate that some of these items have been repaired, Day disputes the quality and completeness of the repairs.

*Bettie Whitaker*

Whitaker is also a CHA tenant, residing in McCafferty Village at 2913 Knight Place, Chester, Pennsylvania, since July 1989. Whitaker's prior bankruptcy proceeding was filed under Chapter 7 on October 14, 1992, and was discharged on March 18, 1993. She filed the instant case *pro se* under Chapter 13 on August 9, 1996. At the time of filing, the CHA's payment records indicate a rental

balance of $3,592.60. The records also show that, as of the beginning of March 1997, Whitaker had paid no postpetition rent, amassing a postpetition balance of $791. Whitaker's plan, like those of Driggins and Day, does not contemplate the assumption of her lease and offers only monthly payments of $7 for 36 months.

An amended proof of claim dated February 3, 1997, filed by the CHA cites a figure of $4,157.60, broken down to an unsecured claim of $3,592.60 and a priority claim of $565. Unlike the Driggins and Day, Whitaker is not represented by counsel and has not objected to CHA's proof of claim.

Whitaker signed a Repayment/Repair Agreement pursuant to the terms of the *Velez* Settlement. Despite her bankruptcy filing a few days prior thereto, which it appears should have stayed same and rendered the results void; Whitaker attended a hearing before Judge Angell on August 12, 1996. The Notice of Disposition recites her rent at $113 monthly, her arrearage at $3,592.60, and states that she is to pay rent for August 1996 prorated from the date of her bankruptcy filing and in monthly amounts of $113 beginning in September 1996. However, Whitaker has made no rent payments whatsoever since her bankruptcy filing, or, indeed, since she received a discharge of her then-outstanding rent debt in her prior bankruptcy.

## C. DISCUSSION

### 1. *The Debtors Are Not Required to Assume Their Leases in Order to Confirm Their Plans and Retain Possession of Their Public Housing Units.*

The CHA's principal arguments are its contention that no public housing tenants, including the Debtors, are entitled to retain possession of their units without assuming their leases pursuant to 11 U.S.C. § 365(a) and curing their rental delinquencies in full pursuant to 11 U.S.C. § 365(b). This argument can prevail only if this court dramatically reverses the principles set forth in its longstanding prior decision in *Sudler, supra.*

We note that *Sudler* has, in the decade since it was decided, been repudiated neither in this district by any court at any level nor by any appellate court in this or any other circuit. It has, however, been attacked by two decisions rendered in the past year in the Western District of Pennsylvania, *In re Collins*, 199 B.R. 561 (Bankr.W.D.Pa.1996) (per McCULLOUGH, J.); and *In re James*, 198 B.R. 885 (Bankr.W.D.Pa.1996) (per MARKOVITZ, CH. J.). *But see In re Curry*, 148 B.R. 966 (S.D.Fla.1992) (follows *Sudler*); *In re Szymecki*, 87 B.R. 14 (Bankr. W.D.Pa.1988) (per BENTZ, J.) (same); and *In re Gibbs*, 9 B.R. 758, *supplemented*, 12 B.R. 737 (Bankr.D.Conn.1981), *aff'd in part & remanded in part sub nom. Gibbs v. Housing Authority of City of New Haven*, 76 B.R. 257 (D.Conn.1983). Not surprisingly, this court is not prepared to repudiate the principles set forth in *Sudler* because we continue to believe that *Sudler* was rightly decided and has met the test of time.

The earlier to the two decisions adverse to *Sudler* was *James*. In that case, the court begins from the premise that Housing Authority of the City of Pittsburgh ("the HACP"), although articulating no independent reason for its actions, was not evicting the resident public housing debtor tenant ("the Tenant") "solely because" of her dischargeable rent delinquency. 198 B.R. at 888. In reaching this conclusion, the *James* court, *id.* at 889, identifies two alternative "purposes" of the HACP as the basis for its actions: (1) HACP

> seeks relief from the automatic stay because the lease in question is no longer in effect because it was deemed rejected by operation of § 365(d)(1). Debtor has no right to occupy the apartment and HACP has no obligation to allow her to remain in possession.[5]

---

5. Another non-discriminatory basis for seeking relief from the automatic stay was articulated in *In re Lutz*, 82 B.R. 699 (Bankr.M.D.Pa. 1988). It is not violative of § 525(a) for a governmental unit to take action against a chapter 7 debtor when a debtor has materially defaulted on its [sic] prepetition obligations under a lease. A landlord (in this instance HACP) is excused from further performance and may seek relief from the automatic stay to take action to evict the debtor, who has no reasonable expectation that the landlord will (or must) continue to

maintain its relationship with the debtor. Election by the landlord to seek relief from [sic] stay to terminate the relationship when the debtor has defaulted is not discriminatory *per se.* 82 B.R. at 704.

(2) HACP

has an obligation to the taxpayer to ensure that tenants pay their rent and an obligation to other applicants to make such housing available to them.

We submit that these two allegedly separate "purposes" for HACP's actions in evicting the Tenant are in fact one and the same "purpose," *i.e.,* because the Tenant has not paid her rent dischargeable in bankruptcy, stated from different perspectives. The concern about the nondebtor waiting list applicants merely expresses an interest in evicting the Tenant for non-payment of dischargeable rent from the alleged perspective of anonymous HACP waiting-list applicants. Moreover, we question whether it benefits present or prospective tenants to basically forfeit their Bankruptcy Code rights under § 525(a) as a condition of a public housing tenancy. Similarly, the allegedly separate "purposes" of the HACP in seeking eviction due to non-assumption of the lease is simply another way of saying that the Tenant has failed to pay rent which she would otherwise have had to pay as one of the conditions for assumption of her lease, presuming, in the process, that the Tenant's assumption of the lease is necessary to prevent her eviction. The "material default" of the Tenant which would allegedly "excuse the HACP's performance" is, again, nonpayment of the dischargeable rent obligation.

The citation and discussion of *Lutz* prompts us to observe that that case did not involve a public housing tenant, but rather a debtor-tenant residing in a federally-subsidized private housing unit. 82 B.R. at 702–03. We acknowledge that, in dicta, the *Lutz* court indicates that it would not follow *Sudler* even in the public housing context. *Id.* at 703–04. As we noted in *Sudler,* tenants of federally subsidized housing can assert that it is violative of the "good cause" eviction requirement for evictions from federally-subsidized housing, as well as evictions from public housing. 71 B.R. at 787. The *Lutz* court did not consider this latter argument,

nor did it address the issue of whether the termination of the subsidy itself for nonpayment of rent dischargeable in bankruptcy would be violative of § 525(a). For our present purposes, however, we need only note that all of these alleged alternative "purposes" for effecting the Tenant's eviction apart from her nonpayment of dischargeable rent are not really alternatives at all.

It therefore appears to us that, despite the HACP's protests to the contrary, it is in fact evicting the Tenant solely because she failed to repay dischargeable rent to it. The actions of the HACP therefore do appear to lie within the scope of 11 U.S.C. § 525(a), no matter how narrowly that Code section is read.

We of course also disagree with the very narrow reading of § 525(a) posited by the *James* court and the *Lutz* court. These courts would apparently limit the application of § 525(a) only to situations where the governmental entity expressly acts *because* the debtor filed bankruptcy. We submit that proving that the governmental entity would not act were the discharged debt not an issue should be sufficient to satisfy § 525(a).

The *Lutz* court appears to believe that, if a public housing authority would evict a similarly-situated nondebtor for non-payment of rent, it is not engaging in discrimination in evicting a debtor for that reason. Again, this ruling would improperly confine § 525(a) to circumstances where the governmental entity presses an intention to evict a tenant merely because the tenant filed bankruptcy and not when a back-rent debt dischargeable in bankruptcy is the cause. This, we submit, is not a proper reading of § 525(a).

Next, *James* takes issue with *Sudler's* holding that § 525(a) "overrides" any effect of 11 U.S.C. § 365(b)(1) in this context. 198 B.R. at 889–90. This argument, we believe correctly, necessarily presumes that § 525(a) is triggered by the eviction of a debtor-tenant. Otherwise there would be no reason to address the application of § 525(a) at all, including its overriding of § 365(b)(1). However, this argument presumes that § 365(b)(1) applies because it holds, we be-

lieve incorrectly, that the Tenant's lease must be assumed in order for her to retain possession of her public housing unit post-discharge.

Finally, the *James* court concludes that the Tenant has no equity, in the form of an ownership interest, in her unit and that relief against her for that reason alone is justified under 11 U.S.C. § 362(d)(2). *Id.* at 891. We cannot agree that a public housing tenant's right to perpetually renew a public housing lease is not an equity therein. We also note our holding in *In re Cabrillo,* 101 B.R. 443, 449–50 (Bankr.E.D.Pa.1989), that, where a Chapter 7 debtor is subjected to a motion for relief based on § 362(d)(2), the debtor can defend against that motion by providing adequate protection to the movant.

The *Collins* decision acknowledges lapses in the reasoning of the *James* court. However, it purports to plug these lapses with improved reasoning in order to reach the same result.

The principle discrepancy in the *James* court's reasoning identified by the *Collins* court is the *James* court's holding regarding the significance of the Tenant's failure to assume the lease. The *James* court never considers the practical question of when and why a Chapter 7 trustee would ever choose to assume a debtor-tenant's lease. Our reflection of these circumstances yields the conclusion that, except in an extraordinary situation where assumption of the lease would further some claims or causes of action which the trustee wishes to pursue, no such assumption would ever take place. It is difficult to see how a public housing lease assumption would very frequently, if ever, work to the benefit of an estate.

Moreover, it is clear that the vast majority, if not all, public housing tenants' bankruptcy cases are no-asset cases in which trustees will have no financial or other interest in a debtor's residential lease, be it in public or private housing. The lease of any and every debtor-tenant, whether residing in public housing or not, would therefore appear subject to rejection.

It is well established, however, that rejection of a lease

does not invalidate, [repudiate,] repeal, or avoid an executory contract. *Accord, In re Modern Textile, Inc.,* 900 F.2d 1184, 1191–92 (8th Cir.1990). Rather, the only effect of rejection is that the executory contract in issue is not assumed and the non-debtor party thereto cannot make an administrative claim against the debtor's estate if the debtor fails to fulfill the obligations of the contract. *[In re] Drexel Burnham [Lambert Group, Inc.], supra,* 138 B.R. at [687,] 703 [ (Bankr.S.D.N.Y.1992) ]; [M. Andrew, *Executory Contracts Revisited: A Reply to Professor Westbrook* ], 62 U. COLO. L.REV. [1] at 8 [ (1991) ]; [M. Andrew, *Executory Contracts in Bankruptcy: Understanding Rejection* ], 59 U. COLO. L.REV. [845,] at 861 [ (1988) ].

*In re Walnut Associates,* 145 B.R. 489, 494 (Bankr.E.D.Pa.1992). Perhaps for this reason, perhaps for the practical reasons discussed heretofore, and perhaps simply because the precedent on this principle, for whatever the reasons, is unbroken, the *Collins* court is compelled to acknowledge, 199 B.R. at 565,

that the automatic rejection of the lease in this bankruptcy case pursuant to § 365(d)(1) effected an abandonment back to the debtor of her rights in the lease. *In re Rosemond,* 105 B.R. 8, 9 (Bankr. W.D.Pa.1989); *In re Knight,* 8 B.R. 925, 929 (Bankr.D.Md.1981); *Szymecki,* 87 B.R. at 15 (Bankr.W.D.Pa.1988).

The *Collins* court appears to make light of this perceived error in the *James* decision. It follows this holding with the statements that, but for § 525(a), the HACP would immediately proceed to evict the Tenant in any event. However, we believe that the principle that a § 365 rejection eliminates the Tenant's rights is in fact critical to the *James* result on several fronts. First, it eliminates the need to consider whether § 525(a) overrides § 365 because lease assumption under § 365 is then no longer significant to the Tenant's retention of her public housing tenancy. Second, it weakens the *James* court's reliance on the Tenant's rejection of her lease as one of the alternative "purposes" justifying HACP's actions in addition to her failure to pay nondischargeable debt. This

weakens the *James* court's argument that, if § 525(a) does apply, it is not proven that the tenant's eviction was "solely because" of § 525(a) discrimination.

■ At this point we note the Debtors' argument that the terms of the new CHA public housing leases in issue, conceived in the court of the *Velez* litigation, literally run from month to month and for that reason cannot be terminated for arrears in allegedly separate leases covering separate months. We are not convinced that this aspect of the lease forms is significant because we believe that, irrespective of the attempt to designate month-to-month lease terms, all public housing leases are in fact properly characterized as perpetual. Also, we do not believe that assumption of any lease for any term is a prerequisite for a tenant to retain a public housing unit.

We note that the holding of the *Collins* court that the *James* court's lease assumption argument is erroneous ultimately leaves the *Collins* court with basically one argument to support the result that *Sudler* was correctly decided. That argument is that a public housing tenancy does not implicate § 525(a) at all.

The *Collins* court apparently recognizes that this proposition on which its decision stands has not been widely accepted. In fact, no case except possibly the flawed dicta in *Lutz*, discussed at pages 364–365 *supra*, can be cited for this principle. In this context it should be noted that, except for the statements in the footnote quoted at pages 363–64 *supra*, the *James* court takes great pains to determine that § 525(a), *though applicable*, should not be applied in that particular fact situation. The *Collins* court is therefore obliged to invoke some rather unusual arguments and propositions in reaching its conclusion that § 525(a) is not applicable. *See* 199 B.R. at 565–68.

The first argument is an assertion that there is a conflict between two federal laws, § 525(a) and certain uncited provisions of 24 C.F.R. which presumably support eviction of public housing tenants who do not pay rent. The *Collins* court resolves this conflict in favor of the 24 C.F.R. regulations because

they are "clearly more narrow" than § 525(a).

We submit that this argument proves far too much. Federal governmental entities presumably should act only as authorized by applicable law. If the *Collins* court's principle that the nonbankruptcy federal law should control when it conflicts with § 525(a) were adopted, § 525(a) would probably never apply against federal governmental entities. On the other hand, if the uncited 24 C.F.R. regulations are held to prevail over a section of the Bankruptcy Code because they more specifically refer to the rights of the federal agency at issue, they would presumably prevail over other Code sections with which they are similarly in conflict as well. These Code sections would appear to include § 362(a) and § 524(a). If this reasoning is adopted, there would be no automatic stay nor a discharge with which the HACP need concern itself because the federal housing regulations would apparently prevail over these as well. Since the CHA admits that it must invoke § 362(d) before it proceeds to evict the Debtors, and has nowhere asserted that public housing rental obligations are nondischargeable, the CHA apparently concedes that this argument is not likely to be correct.

Second, the *Collins* court points to the allegedly "preposterous result" that trustees intending to continue to make use of executory contracts would be subject to § 365(b)(1), but debtors with the same purposes would not. It suggests that debtors contracting with the government would allow such contracts to be rejected and then would attempt to nevertheless enforce their rights under such contracts without the necessity of curing the defaults.

This is a very curious argument for several reasons. First, it fails to recognize that, except where a trustee is appointed, a Chapter 11 debtor, *i.e.*, a debtor-in-possession ("DIP"), stands in the shoes of a trustee, 11 U.S.C. § 1107(a). Thus, although the *Collins* court speaks of a DIP's rejecting a contract to attempt to resurrect the DIP's rights under the contract without being subject to the contract's burdens, such a dichotomy of trustee rights and DIP rights could not exist in a Chapter 11 case. Second, this argument

is inconsistent with the concession two paragraphs before that rejection is not fatal to the Tenant's rights. Finally, *Collins* cites no cases in which a DIP ever attempted any such gambit.

■ Another critical flaw in this argument is the equation of a public housing tenancy with a garden-variety governmental contract, a deficiency shared in the reasoning of the *Lutz* court. In fact, it appears to us that the right to lease a residence *and* the right to be charged rent dependent on the tenant's income[1] constitute matters upon which the Tenant's entire economic status is dependent. Thus, the Tenant's public housing leasehold rights constitute, taken together, a governmental "license, permit, charter, franchise, or other similar grant" of the highest order. It cannot be equated with a governmental "contract," a term not included among the debtor's interests protected in § 525(a). The analogy between a public housing tenant and a debtor holding a garden-variety governmental contract is therefore not well-taken.

The third argument appears to be an attempt to separate the lease ("contract") aspect of a public housing tenancy from its critical, *see* page 367 & n. 1 *supra*, subsidized rent ("grant") aspect. We would submit that these two aspects are, unlike perhaps the housing subsidy context as is at issue in *Lutz, supra*, inseparable. The public housing lease is both a contract and a grant. It is more than just a contract and its sum total rises to at least the level of a "grant," which *is* within the scope of § 525(a).

This same principle was recognized by the Fifth Circuit in analogous circumstances in *In re Exquisito Services, Inc.*, 823 F.2d 151 (5th Cir.1987). There, the court upheld the application of § 525(a) to a government contractor who was taking part in a program of the Small Business Administration ("the SBA"). *Id.* at 154. The *Exquisito* court reasoned that, through the SBA program at issue, Congress authorized the SBA to award specified government contracts to economically or socially disadvantaged businesses on a noncompetitive basis in order that, with SBA assistance, these businesses could grow stronger and ultimately become more competitive. *Id.* Because the SBA program at issue combined a government contract with a government benefits program, the *Exquisito* court found that the debtor's participation was protected under § 525(a) and ruled that the government could not lawfully fail to exercise an option to renew the contract strictly based on the debtor's status as a debtor in Chapter 11. *Id.* at 154–55.

The fourth and fifth arguments of the *Collins* court are not, as they purport to be, additional arguments supporting the principle that § 525(a) does not apply to public housing leases. The fourth argument is, instead, a reworking of the *James* court's argument that, although a public housing lease *is* within the scope of § 525(a), the eviction is not effected "solely because" the Tenant seeks to discharge pre-petition rent. Not having the § 365(b)-related arguments to support its contention of alternative purposes, the *Collins* court identifies, as alternative "purposes" behind the HACP's actions, 199 B.R. at 567,

(a) [HACP's] consequent inability to deliver public housing assistance to other applicants presently on a waiting list who stood ready and willing to comply with their financial obligations, and (b) the possibility, if not likelihood, of undesirable actions by H.U.D. regarding the Housing Authority's continued control over its delivery of public housing assistance.

As we observed regarding the *James* court's contentions regarding this topic at pages 363–64 *supra*, these allegedly alternative "purposes" are not really alternatives at all but rather are merely the same "purpose" of evicting the Tenant for nonpayment of dischargeable rent as seen from different perspectives, *i.e.*, allegedly that of anonymous applicants, and purportedly that of HUD. As we noted in our prior discussion, those arguments do not advance the conclusion that *Sudler* should be discarded. Fur-

---

1. This right to pay a rental which is often far below the market rate for the poorest tenants explains why the Debtors endeavor to hold onto their public housing tenancies despite the presence of severely defective conditions in such units. These tenants are unable to afford superior housing available on the open market.

**368**

thermore, the argument regarding HUD's perspective is not applicable here because the CHA is already in a HUD receivership and HUD is effectively delivering the public housing "service" itself.

Finally, the *Collins* court devotes considerable attention, 199 B.R. at 567–68, to attempting to refute the statements in *Sudler* that § 525(a) should override § 365(b). Particular attention is given to the argument in *In re Caldwell*, 174 B.R. 650, 654 (Bankr. N.D.Ga.1994), that

under the logic of *Curry*, [*supra* ], no landlord could ever insist on a cure of prepetition defaults as the price of assumption because section 524 enjoins any act to collect a discharged debt.

The *Caldwell* result is distinguishable from that in *Sudler*, as that court recognizes, 174 B.R. at 653, because, under the contrasting applicable state law, the *Caldwell* tenant's lease was deemed to be terminated pre-petition. *Compare Sudler*, 71 B.R. at 785–86. Like all cases other than *Collins*, except possibly the above-referenced dicta in *James* and *Lutz, Caldwell* acknowledges that non-terminated public housing lease implicate § 525(a).

Moreover, we cannot agree with *Caldwell's* statement that the specific directives of § 525(a) are in any sense comparable to the very general provisions relating to the impact of a bankruptcy discharge appearing in § 524(a)(2). However, this dispute is entirely beside the critical point on which *Sudler* and *Collins* differ, *i.e.*, whether § 525(a) applies to public housing leases. *Caldwell* joins *Sudler* in holding that it does.

Having dispensed with § 525(a), the *Collins* court quickly concludes that the HACP is entitled to relief from the automatic stay based on §§ 362(d)(1) or (d)(2). If § 525(a) is not dispensed with, relief under these sections is, we submit, justified only if the Tenant fails to pay post-petition rent.

 Even if we were to accept the validity of the *James* and *Collins* decisions, we would have to find CHA's heavy reliance on them misplaced in the context of the present case. Unlike the debtors in those cases who filed under Chapter 7, the instant Debtors filed under Chapter 13 of the Code, which does not include a provision mandating the automatic rejection of the Debtors' leases 60 days after a bankruptcy case is filed. *See* 11 U.S.C. § 365(d)(1). Rather, a Chapter 13 debtor may assume a lease at any time prior to plan confirmation. *See* 11 U.S.C. § 365(d)(2). Contrary to the CHA's assertions, the Debtors' disinclination to assume their leases at this stage does not amount to the leases' rejection. It has long been the rule in bankruptcy that an executory contract that is neither assumed nor rejected continues in place between the parties, passing through the bankruptcy to the reorganized debtor. *In re Polysat*, 152 B.R. 886, 890 (Bankr.E.D.Pa.1993).

In *Polysat, id.* at 886, Judge Fox of this court not only ruled that a truck rental contract that was neither assumed nor rejected continued to exist between the parties following bankruptcy, but also ruled that the debtor's monetary obligations to the lessor of the trucks were discharged pursuant to the debtor's confirmed Chapter 11 plan. The lessor was not, however, prohibited from pursuing damages for the debtor's postconfirmation lease violations nor presumably for taking action solely for the purpose of retrieving the trucks on account of nonpayment. This last point, in the context of the present case, serves only to sharpen the focus on role of § 525(a) and that the only reason that the CHA is seeking to evict the Debtors is because of their nonpayment of dischargeable rent. Unlike the debtor in *Polysat*, the additional protection enjoyed by the Debtors by virtue of § 525(a) protects them from having to relinquish a government benefit due to their nonpayment of a dischargeable debt.

In its Memoranda in support of the Objections to confirmation of the various Debtors' plans, the CHA's principal arguments are based on the *James* court's argument that the Debtors' respective failures to assume their leases are fatal to their claims of rights to continued possession of their units. Thus, the CHA argues that (1) the Debtors' plans cannot be confirmed because they do not provide for either an assumption or a rejection of their leases; (2) the Debtors must assume their leases and cure their defaults to

achieve confirmation of their plans; and (3) § 525(a) does not override § 365(b). The CHA fails to note that the *Collins* court rejects the *James* court's holding that the Debtors' failure to assume their lease is fatal, and that no other courts agree with *James* on that point.

Further, the CHA quotes, out of context, language from our decision in *In re Adams,* 94 B.R. 838, 849 (Bankr.E.D.Pa.1989), reciting that § 525(a) does not eliminate the responsibilities for a Chapter 13 debtor who wishes to do so to assume a public housing lease in the ordinary fashion. However, *Adams* further holds that confirmation of the debtor's Chapter 13 plan did not enhance *nor diminish* the debtor's right to retain her public housing unit, because assumption was immaterial to the debtor's rights. *Id.* We adhere to this holding, which is totally consistent with *Sudler,* and which properly applies *Sudler's* holdings in the Chapter 13 context pertinent to the instant cases.

2. *The Arbitration Clauses in the Debtor's Leases Do Not Require This Court to Defer the Core Function of Allowing Claims Against the Debtors' Estates to an Arbitrator.*

Paragraph 25 of lease form CHA currently employs to regulate its relationships with tenants contains a mandatory arbitration provision requiring all disputes between the CHA and its tenants to be resolved in an arbitration proceeding, setting forth the *Velez* arbitration procedure and providing for arbitration "post *Velez.*" Citing the Federal Arbitration Act, 9 U.S.C. §§ 1–9 ("the FAA"), the CHA contends that we should stay determination of its claims to allow them to be adjudicated by Judge Angell in the District Court's arbitration proceeding. We do not agree that the bankruptcy claims process could thusly be delegated to District Court arbitration, especially when we observe that staying allowance of the claims will needlessly delay proceedings which we are here and now prepared to adjudicate.

In *Zimmerman v. Continental Airlines, Inc.,* 712 F.2d 55 (3rd Cir.1983), the Third Circuit Court of Appeals first interpreted the interplay between the FAA and the Bankruptcy Code. In that decision the Court of Appeals granted bankruptcy courts broad discretion to deviate from an arbitration clause and decide disputed matters within its jurisdiction without resort to arbitration.

Following enactment of the 1984 amendments to the Bankruptcy Code, which limited the jurisdiction of bankruptcy courts to deciding only those matter denominated as core pursuant to 28 U.S.C. § 157, the Court of Appeals reevaluated its rulings in *Zimmerman.* In *Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 885 F.2d 1149 (3rd Cir.1989), the Court of Appeals determined that, in a noncore matter, bankruptcy courts have very limited discretion to deny enforcement of a contractual arbitration clause. Following precedent established by the Supreme Court in, *e.g., Shearson/American Express, Inc. v. McMahon,* 482 U.S. 220, 226, 107 S.Ct. 2332, 2337, 96 L.Ed.2d 185 (1987); and *Mitsubishi Motors Corp., v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 631, 105 S.Ct. 3346, 3356, 87 L.Ed.2d 444 (1985), holding that arbitration clauses are enforceable with the same strength as any other contractual terms, the Court of Appeals stated that the burden is upon the party opposing arbitration to show that Congress intended to limit or preclude the its availability in any particular instance. *Hays, supra,* 885 F.2d at 1156.

In the context of the claims allowance process, which is among the most fundamentally core of any bankruptcy contested matters, we believe that bankruptcy courts continue to retain enhanced discretion to deny enforcement of arbitration clauses. In this respect the *Hays* court carefully limited its decision to only noncore matters. Core proceedings, however, still enjoy enhanced importance under the Bankruptcy Code and its jurisdictional provisions. *See In re Barney's, Inc.,* 206 B.R. 336, 343 (Bankr. S.D.N.Y.1997); *In re Sacred Heart Hospital of Norristown,* 181 B.R. 195, 202 (Bankr. E.D.Pa.1995); and *In re Glen Eagle Square, Inc.,* 1991 WL 71782 (Bankr.E.D.Pa. May 1, 1991), *aff'd,* 132 B.R. 115 (E.D.Pa.1991).

This conclusion is supported by the language, structure, and policies underlying the

Bankruptcy Code. The allowance of claims against the estate is expressly labeled a core proceeding by 28 U.S.C. § 157(b)(2)(B), and § 502(b) of the Code thusly directs the bankruptcy court to determine the allowance of claims:

> [I]f [an] objection to a claim is made, the *court,* after notice and a hearing, *shall* determine the amount of such claim ... and shall allow such claim in such amount .... (emphasis added).

Even in the situation in which the amount of an unliquidated claim is being determined in another forum, the Bankruptcy Code mandates that the bankruptcy court estimate the claim for purpose of allowance to avoid delay in the administration of a case. *See* 11 U.S.C. § 502(c). Moreover, the claims allowance process is regarded as being one of the most elementary functions performed by bankruptcy courts, closely related to the entire bankruptcy distribution process. *See Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 60, 109 S.Ct. 2782, 2800, 106 L.Ed.2d 26 (1989); *In re Marshland Development, Inc.,* 129 B.R. 626, 632 (Bankr.N.D.Cal.1991); *In re Consolidated Lewis Investment Corp.,* 78 B.R. 469, 476 (Bankr.M.D.La.1987); and in *re T.D.M.A., Inc.,* 66 B.R. 992, 996 (Bankr. E.D.Pa.1986).

Thus, in the present case, we have and will exercise discretion to determine the objections of the Debtors to the CHA's claims against them regardless of the arbitration clauses in the Debtors' leases. The exercise of our discretion is mandated by the fact that we are able to determine the claims now, allowing us to immediately move to the issue of confirmation of the Debtors' plans. Deferring allowance of the claims to arbitration would likely result in delays of several months before we would be able to rule on confirmation and thus significantly delay the progress of these cases. It is, moreover, especially critical to rule on confirmation as soon as possible, since the Debtors' plans appear to pay far too little to be presently confirmable. The Debtors require the guidance of a confirmation ruling as soon as possible to permit them to propose confirmable plans and still have sufficient time remaining to perform under them.

It is difficult to perceive how the CHA's own interests would be advanced by further delay. As with most creditors, the CHA's interests would appear best served by the speedy resolution of all of the issues in these cases. The sooner the Debtors' plans are confirmed or their confirmation denied, the sooner all interested parties will know how to conduct themselves hereafter. Meanwhile, if resolution of the claims is deferred to arbitration, and if we were also to condition or deny the CHA relief from the automatic stays to evict the Debtors under applicable state law, the stays will remain in effect while we await the results, delaying the CHA's efforts to either collect rent from the Debtors or to attempt to effect their eviction.

Finally, we note that the CHA's citation to the *In re Chorus Data Systems, Inc.,* 122 B.R. 845 (Bankr.D.N.H.1990), is inapposite. Confirmation of the debtor's plan in *Chorus Data* was not dependant on the litigation which the court referred to arbitration. *Id.* at 848–49. In the present case, however, confirmations of the Debtors' plans are directly dependent on the resolutions of the Debtors' objections to the CHA's claims. Resolution of the objections is necessary to determine the amount that the Debtors must repay the CHA to have confirmable plans.

3. *Warranties of Habitability Are Enforceable Against the CHA to Reduce the Amount of the Debtors' Rental Obligations.*

The CHA also challenges the Debtors' ability to obtain rent abatements on account of its alleged failure to maintain the Debtors' units in habitable condition. This argument is premised on a short line of cases holding that there is no implied warranty of habitability in public housing leases. *See Alexander v. U.S. Department of Housing & Urban Development,* 555 F.2d 166 (7th Cir.1977). *aff'd,* 441 U.S. 39, 99 S.Ct. 1572, 60 L.Ed.2d 28 (1979); *Gibson v. Gary Housing Authority,* 754 F.2d 205 (7th Cir.1985); and *Hurt v. Philadelphia Housing Authority,* 806 F.Supp. 515, 527 (E.D.Pa.1992). We refuse to accept the CHA's argument on this score, however, for two reasons. First, as the Debtors note, their leases each contain an

express warranty of habitability, rendering the question of whether there is an implied warranty not determinative of the Debtors' right to rent abatements. Second, we find that an implied warranty of habitability *is* applicable to public housing tenants in any event.

The CHA devotes considerable attention in its submissions to arguing that there is no implied warranty of habitability in the Debtors' leases, prompting us to give this issue more attention that it appears to deserve in light of the express warranty of habitability that is unambiguously contained in the CHA's new lease form. In § 10 of the lease, entitled "MAINTENANCE," the CHA agrees to do or provide the following:

1. To comply with the requirements of applicable building codes, housing codes, and HUD regulations materially affecting health and safety;

2. To keep buildings, facilities and common areas, not otherwise leased to you for maintenance and upkeep, in a decent, safe and sanitary condition;

3. To make necessary repairs to your unit and the premises and to clean up after making said repairs;

4. To maintain in good working order and safe condition electrical, plumbing, sanitary, heating, ventilating, structural parts of elevators where provided and other facilities supplied or required to be supplied by us;

. . . .

If we fail to comply with applicable building codes and that failure is (1) not caused by you or (2) our correction of the problem is not prevented by you, the Arbitration pursuant to Section 24 may reduce the rent you owe in proportion to the severity of the noncompliance.

The CHA makes additional promises concerning its obligation to repair tenants' rental units in § 11 of the lease form, wherein it states as follows:

C. If your unit is damaged to the extent that conditions are created which are hazardous to the life, health or safety of the occupants, you must immediately notify us. We agree to promptly inspect the premises and inform you whether or not repairs to the unit can be made by us to enable you to continue in occupancy. . . .

D. If we determine that the unit can be restored to a habitable condition and repairs can be made within a reasonable period of time, we agree to promptly make the necessary repairs. If we determine that the unit can be restored to habitability, but repairs cannot be made within a reasonable period of time, we will offer you standard alternative accommodations, if available, until the repairs to your unit are made.

E. If we determine that the unit cannot be restored to a habitable condition, or it is impracticable for us to do so, we will offer you standard alternative accommodations, if available.

F. In the event repairs are not made or standard alternative accommodations are not provided, rent shall be abated in proportion to the seriousness of the damage and loss in value of the premises as a dwelling. . . .

 Pursuant to these lease provisions, the CHA has undertaken an express contractual obligation to maintain the Debtors' units in a safe condition, free from hazards to the life, health and safety of the occupants, and agreed to suffer a reduction in rents if it fails to meet these obligations in a reasonable time. These provisions in and of themselves establish an express warranty of habitability binding on the CHA. These provisions, moreover, merely effectuate federal housing regulations that mandate public housing leases to expressly undertake an obligation and accept a responsibility to adequately maintain public housing stock. *See* 24 C.F.R. § 966.4(e).

 We also find that the CHA is subject to the implied warranty of habitability established under Pennsylvania law in *Pugh v. Holmes*, 486 Pa. 272, 405 A.2d 897 (1979). *See also Miller v. Christian*, 958 F.2d 1234, 1237–39 (3d Cir.1992); *In re Gerst*, 106 B.R. 429, 433 (Bankr.E.D.Pa.1989); and *In re Clark*, 91 B.R. 324, 341–42 (Bankr.E.D.Pa. 1988). Although the CHA correctly points

out a few federal decisions have ruled against the existence of a state-law implied warranty of habitability in public housing leases, we find that these cases lack persuasive force.

The case cited by the other two cases as the ultimate authority for the absence of an implied warranty of habitability in public housing leases is *Alexander, supra,* 555 F.2d at 166. In this case, the former tenants of a federally-owned housing development sued HUD for a refund of their security deposits, alleging a breach of the implied warranty of habitability. The court, however, rejected the tenants' claim and held as a matter of federal law that there was no warranty of habitability that could be applied against HUD. Although this case involved claims made directly against the federal government, the two other cases cited by the CHA, *Gibson, supra,* 754 F.2d at 205; and *Hurt, supra,* 806 F.Supp. at 515, uncritically relied upon *Alexander* to hold that there is no state-law warranty of habitability applicable to public housing authorities as well.

The reasoning of *Alexander,* however, does not extend so far as to support that latter proposition. In *Alexander* the court decided, as a matter of federal common law, that there was no warranty of habitability implied in the leases of tenants in a federally-owned housing project. The underlying issues in the case were federal preemption of state law and the content of federal common law. *Compare Conille v. Secretary of Housing & Urban Development,* 840 F.2d 105 (1st Cir. 1988) (analyzing these issues and determining that there is a federal common law warranty of habitability). A far different question is presented in the subsequent cases, and in the instant case, than was addressed in *Alexander, i.e.,* whether a state-chartered housing authority is subject to a state law implied warranty of habitability. *Alexander* does not address this question and contains no guidance on this issue.

The inapplicability of *Alexander* leaves the CHA with no authority to support its argument against the application of the implied warranty of habitability in public housing leases. In fact, the CHA cites no authority at all for the proposition that state housing laws are somehow inapplicable to state-chartered housing authorities. In numerous other instances, courts in this jurisdiction appear to have implicitly accepted the application of an implied warranty of habitability to housing authority leases without question. *See, e.g., Farley v. Philadelphia Housing Authority,* 102 F.3d 697 (3d Cir.1996); *Allen v. Housing Authority of County of Chester,* 683 F.2d 75, 78 (3d Cir. 1982); *In re Kirkland,* 1994 WL 369537 (Bankr.E.D.Pa. July 6, 1994); *In re Whitehead,* 1991 WL 91094, at *2, adopted,* Misc. No. 96-0345 (E.D.Pa. May 29, 1991); and *In re Bennett,* 1988 WL 51644, at *2 (E.D.Pa. May 18, 1988), *adopted,* Misc. No. 88-0247 (E.D.Pa. March 13, 1989). *Cf. Boston Housing Authority v. Hemingway,* 363 Mass. 184, 293 N.E.2d 831 (1973) (adopting an implied warranty of habitability under Massachusetts state law in a case against a public housing authority). Furthermore, Pennsylvania Housing Authorities Law itself expressly requires housing authorities to abide by all applicable housing and sanitary laws and regulations in place in the jurisdiction in which the authority is located. 35 P.S. § 1556.

We therefore find that there is simply no basis on which to find that a state housing authority such as the CHA is immune from such a broad and basic tenant of state landlord-tenant law as the implied warranty of habitability. Accordingly, we hold that CHA is subject to the implied warranty of habitability arising under Pennsylvania law, and we will grant the Debtors appropriate rent abatements to compensate them for the CHA's violations of this warranty.

It is clear that each of the Debtors have and continue to experienced numerous defective conditions in their units. The most notable common warranty breach relates to the chronic lack of heat in each of the Debtors' units. The CHA acknowledges the problem with the heat in the building in which all three of the Debtors reside, but has decided as a matter of policy not to correct the condition because of long-range plans to demolish the Debtors' building. These circumstances establish an admittedly serious breach of the express warranty of habitability in the Debtors' leases as well as the

implied warranty of habitability under Pennsylvania law, thus entitling the Debtors to rent abatements. Moreover, the CHA's admission that it is going to demolish the building, along with the number and severity of repair problems reported by the Debtors over the years, combine to paint a picture of a severely-dilapidated building, so dilapidated that it is beyond the point at which patchwork repairs can any longer remedy the premises' fundamental structural deficiencies. Accordingly, for the most part we credit the testimony of the Debtors as to the variety of problems they have experienced and find that the Debtors have and will continue to experience numerous unsafe and unsanitary conditions as long as they remain in their current units.

In the case of Driggins, in addition to the habitability problems, the CHA also seriously violated its obligation under her lease and applicable federal regulations to place her in a dwelling appropriate to the size and composition of her family. The CHA admits that Driggins has lived in overcrowded conditions for years and that it has taken no action to move her. Judge Angell's Notice of Disposition of March 8, 1996, clearly recognized the severity of Driggins' overcrowding and directed that the matter be relisted within 60 days if she were not relocated to a suitably-sized unit within that time period. That deadline passed without any action on the part of the CHA, or by the District Court.

In determining the amount of rent abatement to allow Debtors Day and Whitaker, we are guided by the terms of the *Velez* Settlement, to which all of these parties expressly agreed. We find that there has been no substantial changes in the circumstances of the conditions in the units of Day and Whitaker since the execution of the Repayment/Repair Agreements on April 10, 1995(Day), and April 14, 1995 (Whitaker). The parties' prior agreement therefore establish reasonable terms for compensating Day and Whitaker for the poor conditions of their dwelling units, but at the same time provide substantial compensation to the CHA for the units, which these Debtors have chosen to retain. *See* page 367 n. 1 *supra.*

We will therefore reduce the unsecured and priority portions of the CHA's claim against Day by fifty (50%) percent, leaving the CHA with a general unsecured claim of $4,298.80 and a priority claim of $1,049.00 against her, which fixes the total CHA claim against her at $5,347.60. We note in making this adjustment to the claim against Day that she previously participated in the *Velez* Settlement and pursuant thereto was to have received a fifty (50%) percent rent abatement on or about December 1985. However, our review of the CHA's records confirms her claim in court that this abatement was never credited to her account. Accordingly, our application of a fifty (50%) percent abatement to Day's total outstanding prepetition balance provides her with the credit which in part she should have already received without giving her a windfall by abating an amount that has already been reduced.

Since Whitaker, proceeding *pro se,* has not filed an objection to CHA's claim we are not able to provide her with a rent abatement. However, we can assume that she will now proceed to do so, potentially reducing the general unsecured and priority portions of the claim of the CHA against her to $1,796.30 and $232.50, respectively, or a total of $2,028.80.

Driggins, on the other hand, presents a specific serious issue regarding the severe overcrowding of her unit, in addition to the same type of warranty of habitability issues raised by Day and Whitaker. Also, we note that Driggins never joined in the *Velez* Settlement, unlike Day and Whitaker. It is apparent that the CHA would have accepted these terms from Driggins. It is far from certain that Driggins would have accepted such terms on her part. We therefore conclude that, at least until she is relocated, Driggins is entitled to a larger rent rebate than Day, Whitaker, or the other signatories to the *Velez* Settlement. We will therefore fix Driggins' rent rebate at seventy-five (75%) percent of the rent alleged by the CHA to be owed by her. This calculation causes us to fix the claim of the CHA against Driggins at $978.81 classified as general unsecured and $167.00 classified as priority, or a total of $1,145.81.

**4. To Confirm Their Plans the Debtors Will Have to Repay the Allowed Claims of the CHA in Full.**

To achieve confirmation, the Debtors' plans must satisfy all of the provisions of 11 U.S.C. § 1325(a). The CHA brings to our attention this court's prior decision in *In re Brooks,* 1995 WL 472179, at *1, *7 (Bankr. E.D.Pa. August 5, 1995), in which we held the following regarding a public housing tenant debtor who filed a Chapter 13 case within six years of having receiving a Chapter 7 discharge:

> After once again falling behind in her rent due after the period covered by her discharge in [her prior Chapter 7 1994 case in which she obtained a discharge of her rental obligations through the date of that filing], the Debtor was compelled to file the instant Chapter 13 bankruptcy case on May 1, 1995, to prevent her eviction. In contrast to her ability to retain her public housing unit without payment of rent as a result of her discharge in the 1994 Case, *see In re Sudler,* 71 B.R. 780, 786–87 (Bankr.E.D.Pa.1987), the Debtor, in light of that discharge, was now obliged to pay all of the rent delinquency arising after the filing of the 1994 Case in her Chapter 13 plan as a prerequisite to retention of her public housing unit, by operation of 11 U.S.C. § 1325(a)(4).[1]

---

1. This Code section requires a debtor to pay each allowed unsecured claimant the amount of the claim payable if the debtor's estate were liquidated under Chapter 7. Since the Debtor could not receive a discharge of any of her debts, including the post–1994 Case-discharge rent owed to the PHA, in a Chapter 7 case, *see* 11 U.S.C. § 727(a)(8), payment by the Debtor of all of her post–1994 Case rent in her Chapter 13 plan is necessary to obtain a discharge of this obligation and retain her public housing unit.

---

The Debtors argue that the foregoing *Brooks* holding, if it is intended to declare that a debtor in a Chapter 13 case commenced within six years of a Chapter 7 discharge may never discharge the claim of creditors whose claims were previously discharged in the prior Chapter 7 case, sweeps too broadly. They further contend that this result is contrary to our decision in *In re Lilley,* 201 B.R. 725 (Bankr.E.D.Pa.1996), af-

ter the remand of prior decisions in that case directed by the decision reported at 91 F.3d 491 (3d Cir.1996), that debts not discharged in a prior Chapter 7 case can be discharged in a subsequent Chapter 13 case. We fail to see any inconsistency of *Brooks* with *Lilley.* In *Lilley* the debt at issue was *not* discharged in the prior Chapter 7 case. Here, later debts to the same creditor, similar in nature to debts previously discharged in previous Chapter 7 cases, are sought to be discharged in Chapter 13 with only minimal payments, causing the latter Chapter 13 cases to be the functional equivalent of the earlier Chapter 7 cases.

The Debtors cite to several cases holding that debtors are not precluded from confirming Chapter 13 plans proposing partial payments to unsecured creditors in cases filed within six years from receipt of prior Chapter 7 bankruptcy discharges. *See In re Baker,* 736 F.2d 481, 482 (8th Cir.1984); and *In re Gayton,* 61 B.R. 612, 613–14 (Bankr.9th Cir.1986). However, both of these cases qualify their holdings by further holding that confirmation of partial-payment plans in subsequent Chapter 13 cases which are essentially new Chapter 7 cases are impermissible, citing *In re Chaffin,* 4 B.R. 324, 325–27 (Bankr.D.Kan.1980). *Accord, In re Strauss,* 184 B.R. 349 (Bankr.D.Neb.1995).

The plans proposed by the present Debtors are no more than disguised Chapter 7 liquidations intended solely to avoid payment of rent to the CHA falling due after the Debtors legitimately received discharges of prior rent obligations in their previous Chapter 7 cases. By proposing to pay only $25, $10, and $7 per month, respectively, for 36 months, the Debtors will remit to the CHA only small sums in satisfaction of claims that are fixed at considerably higher amounts. In the cases of Day and Whitaker, the CHA would not receive enough to pay the CHA's priority claims, as required by 11 U.S.C. § 1322(a)(2).

The primary purpose of the Debtors' cases are obviously to discharge rent otherwise due and owing to the CHA. Because even the authorities cited by the Debtors hold that the Debtors may not have the benefit of two

effective Chapter 7 liquidations within a six-year period, we will require the Debtors to pay all of the CHA's claims in full to achieve confirmation of their respective plans.

In so doing, we concede that the reasoning of the *Brooks* case is, as the Debtors suggest, too broad. Rather, as the courts in *Baker, Gayton, Chaffin,* and *Strauss* all suggest, we should carefully analyze the facts of the particular subsequent Chapter 13 case to determine whether the plans have been proposed in good faith, pursuant to 11 U.S.C. § 1325(a)(3), as per the standards enunciated in *In re Lilley,* 91 F.3d 491, 496 (3d Cir. 1996).

We therefore conclude that the conclusion reached in *Brooks,* if not its total reasoning, is properly applied to the Debtors. Thus, as a condition for allowing them to proceed to discharge rent obligations owed to the CHA again in these Chapter 13 cases, filed within the six-year period following their prior Chapter 7 discharge, we will require the Debtors to propose and perform according to Chapter 13 plans which will pay to the CHA all of the rent obligations falling due subsequent to their Chapter 7 discharges.

Pursuant to this result, we will require Driggins to file a plan which will pay all of the CHA's allowed claims of $1,145.81. We will require that she file such a plan by May 23, 1997, and we will schedule a final confirmation hearing on June 19, 1997. In addition, Driggins must remain current on payment of one-quarter of her rent otherwise due, $41.75 monthly, in the future. Day will be obliged to similarly propose and perform under a plan which will obligate her to pay the CHA's allowed claim of $5,347.60, plus continue to pay half of her rent due, presently $126 monthly. Whitaker will be required to file and serve an objection to the CHA's proof of claim and an amended plan and a plan contemplating payments of $2,028.80 to the CHA, plus pay half of her current rent, or $56.50 monthly.

If the Debtors are unable or unwilling to comply with these directives, these case will be dismissed on June 19, 1997. We will carry the CHA's Motions for relief to that date as well to determine whether such relief should be granted in addition to, or as an alternative to, dismissal of these cases at that time.

### D. CONCLUSION

An Order effecting the foregoing results will be entered by us.

### ORDER

AND NOW, this 15th day of May, 1997, after hearings of March 18, 1997, and April 1, 1997, on the Objections to confirmation of the Debtors' Chapter 13 plans ("the Confirmation Objections") filed by the Chester Housing Authority ("the CHA"); Motions of the CHA to obtain relief from the automatic stay ("the Motions"); and Objections of Debtors Day and Driggins to the proofs of claim filed by the CHA in their cases ("the Claims Objections"), it is hereby ORDERED AND DECREED as follows:

1. The Confirmation Objections are SUSTAINED in substantial part as reflected in the within Opinion.

2. Confirmations of the Chapter 13 Plans of each of the Debtors are DENIED.

3. The Claims Objections of Driggins and Day are SUSTAINED IN PART. The CHA's claim against Driggins is allowed in the amount of $978.81 as a general unsecured claim and $167 as a priority claim, or a total of $1,145.81. The CHA's claim against Day is allowed in the amount of $4,298.60 as a general unsecured claim and $1,049.00 as a priority claim, or a total of $5,347.60.

4. The Debtors shall resolve all outstanding impediments to Confirmation, including those identified in the foregoing Opinion, by filing and serving Amended Plans in all respects consistent with this Opinion and, in the case of Debtor Whitaker, also filing and serving an objection to the proof of claim of the CHA, on or before May 23, 1997, or these cases will be dismissed.

5. A final hearing to consider confirmation of any Amended Plans filed in conformity with this Order, dismissal of these cases if this Order or other attendant circumstances justify same, a hearing on any Objection to CHA's proof of claim against her filed by Whitaker, and hearings to further consider

whether the Motions should be granted at that time, are all scheduled on

THURSDAY, JUNE 19, 1997, AT 9:30 a.m.

and shall be held in bankruptcy Courtroom No. 1, Second Floor, 900 Market Street, Philadelphia, PA 19107.

6. No continuances of the aforementioned deadlines or hearings should be anticipated, and these cases will in all probability be dismissed on June 19, 1997, if Chapter 13 plans cannot be confirmed on that date.